**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SRM GLOBAL FUND LIMITED PARTNERSHIP,** | |
| **Plaintiff,** | **AMENDED COMPLAINT** |
| **v.** | NO. 09-cv-5064 (RMB) |
| **COUNTRYWIDE FINANCIAL CORPORATION (n/k/a BANK OF AMERICA HOME LOANS), ANGELO R. MOZILO, DAVID SAMBOL, ERIC P. SIERACKI, BANK OF AMERICA CORPORATION and KENNETH D. LEWIS,** |  |
| **Defendants.** | |

SRM Global Fund Limited Partnership ("SRM" or "Plaintiff") alleges the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.

## I. PRELIMINARY STATEMENT

1.    This action arises out of material misrepresentations and omissions by Defendants, Countrywide Financial Corporation (n/k/a Bank of America Home Loans) ("Countrywide" or "CFC"), Angelo R. Mozilo ("Mozilo"), David Sambol ("Sambol"), Eric P. Sieracki ("Sieracki"), Bank of America Corporation ("Bank of America") and Kenneth D. Lewis ("Lewis"), which artificially inflated the price of Countrywide common stock and other securities and caused Plaintiff to retain its investment in Countrywide and to purchase Countrywide common stock and other securities at inflated prices, which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions

were gradually revealed, thereby damaging Plaintiff.  By this action, Plaintiff seeks to recover its damages caused by Defendants' misrepresentations and omissions.

2.       Countrywide was at all relevant times a global diversified financial services provider and a leading originator, servicer and insurer of mortgages in the United States.  On or about July 1, 2008, Countrywide was merged into a wholly owned subsidiary of Bank of America.

3.       Beginning at least as early as the beginning of 2007, Defendants made material misrepresentations and omissions to Plaintiff about Countrywide's financial condition, including the business risks caused by Countrywide's need for additional capital and liquidity, both in public statements and directly to Plaintiff in personal communications.

4.       Among other things, Defendants Countrywide, Mozilo, Sambol and Sieracki (the "Countrywide Defendants") repeatedly assured Plaintiff and the investing public that Countrywide had adequate capital and liquidity and was in a strong financial position.  (*See, e.g.,* ¶¶ 31-32, 34-35, 38-39, 43, 49, 53, 56-57, 62, 72, 74-75, 79, 82-83, 87-88, 95, 112-114, 121, below.)

5.       In January 2008, Bank of America's Chief Executive Officer, Kenneth Lewis, stated publicly that Countrywide "had a very impressive liquidity plan," and "had their backup lines in place."  (*See* ¶ 98, below.)

6.       In April 2008, Lewis also stated publicly that "the deep due diligence we performed [in connection with Bank of America's acquisition of Countrywide] confirmed our belief that there is great long-term value embedded in Countrywide's business." (*See* ¶ 118, below.)

2

7.     In fact, as the Countrywide Defendants later revealed, and as both they and Lewis and Bank of America (the "Bank of America Defendants") knew at the time, Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared in August 2007. (*See* ¶¶ 125-126, below.)

8.     All of Defendants' misrepresentations and omissions concerned facts that were peculiarly within the knowledge of Defendants and which were not readily available to Plaintiff. As Defendants knew, as a result of Defendants' misrepresentations and omissions, Plaintiff was acting under mistaken beliefs about these material facts.  Defendants breached their duty by failing to disclose the truth to Plaintiff.

9.     Defendants also deceived Plaintiff through partial and ambiguous statements that non-public information available to Defendants rendered materially misleading.  Defendants breached their duty by failing to disclose that information to Plaintiff.

10.     Defendants' misrepresentations and omissions were material in that a reasonable investor would have considered it significant that Countrywide had ceased to be a viable company in July 2007 and that liquidity had disappeared in August 2007.

11.     By virtue of the misrepresentations and omissions alleged in this Complaint, Defendants artificially inflated the price of Countrywide common stock and other securities and caused Plaintiff to retain its investment in Countrywide and to purchase Countrywide common stock and other securities at inflated prices, which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were gradually revealed, thereby damaging Plaintiff.

3

12.    Countrywide stock lost nearly 90% of its value in just nine months as the truth about the problems at Countrywide concealed by Defendants' misrepresentations and omissions were gradually revealed.

13.    Defendants' material misrepresentations and omissions caused Plaintiff substantial damages on its investment in Countrywide. Plaintiff was injured by Defendants' misrepresentations and omissions, which concealed Countrywide's deterioration and vulnerability to changing market circumstances.

14.    By virtue of the material misrepresentations and omissions made to Countrywide's shareholders, Defendants are liable to Plaintiff, *inter alia*, under Sections 10(b), 18(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j, 78r and 78t, including Rule 10b-5 promulgated under Section 10(b) by the Securities and Exchange Commission ("SEC") (17 C.F.R. 240.10b-5), and under the common law of the State of New York.

## II. JURISDICTION AND VENUE

15.    This Court has jurisdiction of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 (federal question) and 1367 (pendant jurisdiction). The claims asserted here arise under §§ 10(b), 18(a) and 20(a) of the Exchange Act and SEC Rule 10b-5 and the common law of the State of New York.

16.    Venue is proper in this district under § 27 of the Exchange Act and 28 U.S.C. § 1391. Countrywide and Bank of America both have offices in this district and many of the acts and transactions giving rise to the violations of law complained of occurred here.

17.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the

United States mails, telephone communications systems, and facilities of the national securities markets.

## III. **THE PARTIES**

18.    Plaintiff SRM Global Fund Limited Partnership is a Cayman Island registered private investment fund that invests in a variety of asset classes on behalf of dozens of investors in the United States and around the world, including major international institutions and governmental and non-governmental pension funds.  SRM owned approximately 50 million shares of Countrywide stock in 2008 and SRM's investment in Countrywide, including common stock and other securities, (SRM's "Countrywide investment") was valued at certain relevant times at over $500 million.

19.    Until July 1, 2008, Countrywide Financial Corporation was a Delaware corporation with its principal place of business in the State of California.  On July 1, 2008, Bank of America completed its acquisition of Countrywide, whereby Countrywide was merged into a wholly owned subsidiary of Bank of America which was then renamed "Countrywide Financial Corporation" and which is the successor to the business and interests and assumed the liabilities of the Countrywide Financial Corporation which merged into it on July 1, 2008.  The Bank of America subsidiary Countrywide Financial Corporation is a Delaware corporation with its principal place of business in the State of California.  It is now known as Bank of America Home Loans.

20.    Defendant Angelo R. Mozilo, Countrywide's co-founder, was, at all relevant times, Chairman of the Board and Chief Executive Officer of Countrywide.

21.    Defendant David Sambol was, at all relevant times, Countrywide's President and Chief Operating Officer and became a director of Countrywide in September 2007.

22.    Defendant Eric P. Sieracki was, at all relevant times, Executive Managing Director and Chief Financial Officer of Countrywide and responsible for oversight of Countrywide's major financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation.

23.    Defendant Bank of America Corporation, a Delaware corporation with its principal place of business in North Carolina, is the largest commercial bank in the United States by assets.

24.    Defendant Kenneth D. Lewis was, at all relevant times, Chairman of the Board, Chief Executive Officer and President of Bank of America.

25.    Defendants Mozilo, Sambol and Sieracki (the "Individual Countrywide Defendants"), because of their positions with Countrywide, possessed the power and authority to control the contents of Countrywide's SEC filings, reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. They were provided with copies of Countrywide's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with Countrywide, and their access to material non-public information available to them but not to the public, the Individual Countrywide Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and the positive representations being made were then materially false and misleading. In the alternative, the Individual Countrywide Defendants were reckless in making and causing Countrywide to make the materially false and misleading statements of its financial condition alleged in this Complaint.

26.    Defendant Lewis, because of his position with Bank of America, possessed the power and authority to control the contents of Bank of America's SEC filings, reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. He was provided with copies of Bank of America's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position with Bank of America, and his access to material non-public information available to him but not to the public, Lewis knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and the positive representations being made were then materially false and misleading. In the alternative, Lewis was reckless in making and causing Bank of America to make the materially false and misleading statements of Countrywide's financial condition alleged in this Complaint.

## IV.  FACTUAL BACKGROUND

27.    Countrywide was at all relevant times an industry leader in originating and servicing subprime mortgages. Subprime mortgages are mortgage loans made to borrowers who do not qualify for the best market interest rates because of their deficient credit histories or scores.

28.    Subprime mortgages have a higher rate of default than other mortgages. Subprime mortgages are also subject to higher rates of interest, reflecting their higher risk.

29.    In or about the end of 2006, delinquency and default rates on subprime mortgages were rising.

30.    Investors were concerned about the risk to Countrywide's business and prospects from its exposure to subprime mortgages.

31.     On April 26, 2007, on Countrywide's Q1 2007 earnings conference call, Defendant Sambol stated, "we have far more significant amount of excess capital than what the rating agency models would suggest or even what regulatory capital requirements are."

32.     On the same call, Defendant Mozilo told investors "[w]e have excess capital."

33.     Defendants Sambol's and Mozilo's statements on Countrywide's Q1 2007 earnings conference call were materially false and misleading when made because, as Defendants Mozilo and Sambol knew, Countrywide did not have excess capital, but was facing significant liquidity problems.

34.     On May 9, 2007, Countrywide filed its Q1 2007 Form 10-Q, which represented that Countrywide did "not expect the reduction in liquidity for nonprime loans to have adverse effects on [their] ability to effectively meet [their] financing requirements."

35.     That same filing also stated: "We believe we have adequate financing capacity to meet our currently foreseeable needs."

36.     These statements, among others, in Countrywide's Q1 2007 10-Q were materially false and misleading when made because, as the Countrywide Defendants knew, Countrywide faced significant liquidity problems and did not have financing capacity in place or available to meet its foreseeable needs.

37.     On or about May 23, 2007, Countrywide hosted a Fixed Income Investor Day meeting in New York City.

38.     At this Investor Day meeting, Defendant Sambol represented, *inter alia*, that "while the subprime correction did have a material impact on our first-quarter results, we've made all the necessary adjustments to provide for further profitability." Sambol's presentation further represented that Countrywide's "core fundamentals are strong."

39.    Defendant Sieracki's presentation at the Investor Day meeting touted Countrywide's "[s]trong asset liquidity and quality, funding liquidity and capital adequacy" and represented that Countrywide's "[c]ontingent liquidity planning provides highly reliable financing options if access to capital markets is impaired."

40.    Defendants Sambol's and Sieracki's statements at the May 23, 2007 Fixed Income Investor Day were materially false and misleading when made because, as Sambol and Sieracki knew, Countrywide had failed to provide for adequate capital reserves and other measures necessary to deal with Countrywide's significant liquidity problems, or to provide adequate safeguards for its capital reserves or financing capacity.

41.    On June 13, 2007, at Countrywide's annual stockholder meeting, Defendant Mozilo boasted of Countrywide's "integration of strong capital and risk-management activities" which "keep our Company in excellent fiscal condition."

42.    Defendant Mozilo's statements during the June 13, 2007 Countrywide annual stockholder meeting were materially false and misleading when made because Countrywide was not in "excellent fiscal condition" but was actually suffering a liquidity crisis.

43.    On or about July 24, 2007, during Countrywide's Q2 2007 earnings conference call, the Countrywide Defendants misled the investing public, including SRM, with respect to Countrywide's financial condition, telling investors that Countrywide had sufficient capital and that it would survive the tightening credit market and would end up stronger after the credit market loosened up.  Their misrepresentations and omissions included, but were not limited to, the following (emphasis added):

- **Mozilo:** "Notwithstanding current environment factors and their near-term impact on earnings, we believe that **the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which we believe will enhance the Company's long-term earnings growth prospects. We expect to leverage the strength of Countrywide's capital liquidity positions, superior business model, and best in class workforce to emerge in a superior competitive position coming out of the current housing downcycle.**"

- **Mozilo:** "We've come out of it always stronger, and I believe we will come out of this stronger even stronger than we ever have in the past, because **we are a much bigger and better Company than we ever, ever have been in the past.**"

- **Sambol:** "**I can tell you that the management team believes that this disruption, while certainly not a positive to our near term, will be very beneficial for the Company in the long term in terms of rationalizing and providing for what we believe is an overdue correction to the industry.** And a correction that will, we believe, result in much of the overcapacity that exists in the market today working itself out. **So our view of the future remains very, very bullish for those reasons.**"

- **Sieracki:** "I can give you some overview comments on our liquidity, **but we're certainly not going to have any issues funding the Company. We have a very conservative liquidity management philosophy, we have adequate diversified and reliable sources of liquidity available.** The pressure point would be short-term funding. We have got $95 billion of short-term liquidity funding sources. At June 30, $76 billion of that $95 billion was available and unused. The Bank represents another highly reliable source of liquidity. They had an additional $27 billion of unused liquidity at June 30. In terms of contingency planning for the situation you referred to, we contemplate slower turn times, holding securities below. AAA, limited market access, etc.; and we still have plenty of liquidity cushion. We have a policy of prefunding our term debt. And quite candidly we do not need to issue medium-term notes again in 2007 if we choose not to. Probably the last comment I would make to comfort you is that our short-term spreads were totally unaffected at our [AB/CP] conduits. We funded our normal CP this morning and there was no friction of any kind on price, size, or term of issuance. **So, we have abundant excess capital in terms of equity and we have tremendously liquidity sources to fund ourselves through this situation. And we feel very, very comfortable about our liquidity scenario overall.** Hope that's helpful."

- **John McMurray, Countrywide's Senior Managing Director and Chief Risk Officer:** "Yes, well, two things. **In terms of our capital position, I would characterize where we are at as we are in good shape and strong capital position. We have talked in the past about having excess capital. We remain of the view that we have excess capital in the near-term, certainly over the next quarter or so.** We intend to put that capital to use by investing in the balance sheet. As Kevin mentioned, we expect to use our balance sheet to hold additional assets as a result of some of the volatility out there until the secondary market conditions normalize."

44.    These representations regarding Countrywide's liquidity and capital were false, as the Countrywide Defendants knew at the time and as Mozilo and Sambol eventually admitted.

45.    In fact, Countrywide ceased to be a viable company in July 2007, the same month as the Q2 2007 earnings call. The Countrywide Defendants fraudulently failed to disclose this fact, which was peculiarly in their knowledge and not readily available to Plaintiff, even though, as a result of their misrepresentations and omissions, the Countrywide Defendants knew that Plaintiff was operating under mistaken beliefs about Countrywide's financial condition.

46.    In reliance on the above misrepresentations and omissions, Plaintiff purchased nearly 5.5 million shares of Countrywide common stock in the week following Countrywide's Q2 2007 earnings call and retained its existing Countrywide investment.

47.    Had the Countrywide Defendants revealed the truth about Countrywide's financial condition, SRM could have investigated the danger to Countrywide's business from its significant liquidity problems and what efforts, if any, the Countrywide Defendants were making to address Countrywide's ceasing to be viable. Plaintiff would have relied on the results of this investigation in deciding whether to hold or sell its Countrywide investment. In actuality, the Countrywide Defendants' material misrepresentations and omissions denied Plaintiff the opportunity to investigate Countrywide's problems and the efforts, if any, Countrywide was taking to address them.

11

48.    Had the Countrywide Defendants revealed the truth about Countrywide's financial condition, SRM would not have increased its investment in Countrywide and would have sold all or a substantial portion of its existing Countrywide investment.

49.    On August 2, 2007, Countrywide issued a press release entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition," stating (emphasis added):

> "Countrywide has longstanding and time-tested funding liquidity contingency planning," said Eric P. Sieracki, Chief Financial Officer. "These planning protocols were designed to encompass a wide variety of conditions, including recent secondary market volatility. **Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today.** We place major emphasis on the adequacy, reliability and diversity of our funding sources. It is important to note that short-term liquidity is used exclusively to fund our highest credit quality, most liquid assets.

> **"Our mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank,"** Sieracki continued. "In fact, we have almost $50 billion of highly-reliable short-term funding liquidity available as a cushion today. It is important to note that the Company has experienced no disruption in financing its ongoing daily operations, including placement of commercial paper.

> "Countrywide's financial condition remains strong, as evidenced by over $14 billion of net worth, significant excess capital and our strong investment grade credit ratings," Sieracki concluded.

50.    Defendant Sieracki's statements in Countrywide's August 2, 2007 press release were materially false and misleading when made. As Defendants Mozilo and Sambol later admitted to Plaintiff, liquidity had disappeared on the very date of this press release, August 2, 2007 and Countrywide had ceased to be viable in July 2007.

51.    The disappearance of liquidity was highly significant for a business like Countrywide's, in which liquidity was essential. Countrywide needed balance sheet liquidity in order to meet its current obligations. Countrywide also needed (i) adequate replacement liquidity in order to renew the short-term funds used to finance Countrywide's existing mortgages and

mortgage-backed securities; and (ii) additional liquidity in order to issue new mortgages and mortgage-backed securities.

52.    This August 2, 2007 press release failed to disclose that liquidity had disappeared or that Countrywide had ceased to be a viable company the month before, omitting material facts peculiarly in the Countrywide Defendants' knowledge and not readily available to Plaintiff, even though, as a result of their misrepresentations and omissions, the Countrywide Defendants knew that Plaintiff was operating under mistaken beliefs about Countrywide's financial condition.

53.    On August 6, 2007, Countrywide filed a Form 8-K in order to further reassure investors regarding its liquidity. The August 6, 2007 8-K, which was signed by Defendant Sieracki, contained Countrywide's "Liquidity Sources" schedule as of June 30, 2007, which reported that Countrywide's net available liquidity was $186.5 billion.

54.    The representations in the August 6, 2007 8-K were materially false and misleading when made because liquidity had disappeared four days earlier and Countrywide was in a liquidity crisis with unknown prospects for continued liquidity.

55.    Plaintiff read these materially false and misleading representations in Countrywide's August 6, 2007 8-K and relied on them in Plaintiff's analysis of Countrywide and in deciding to retain and increase its Countrywide investment.

56.    On August 9, 2007, Countrywide filed its Q2 2007 Form 10-Q, which assured investors that Countrywide had "adequate funding liquidity to accommodate these marketplace changes in the near term."

57.    In that same filing, Countrywide sought to further reassure investors about its liquidity:

13

We have contingency planning protocols for funding liquidity that were designed to encompass a wide variety of market conditions. We place major emphasis on the adequacy, reliability and diversity of our funding sources....We have maintained access to our traditional, highly reliable short-term liquidity sources.

58.     These claims in Countrywide's Q2 2007 10-Q were materially false and misleading when made because liquidity had disappeared a week earlier and Countrywide had ceased to be a viable company the previous month, as Defendants Mozilo and Sambol later admitted to Plaintiff.

59.     Countrywide's Q2 2007 10-Q failed to disclose that liquidity had disappeared a week earlier or that Countrywide had ceased to be a viable company the month before, omitting material facts peculiarly in the Countrywide Defendants' knowledge and not readily available to Plaintiff, even though, as a result of their misrepresentations and omissions, the Countrywide Defendants knew that Plaintiff was operating under mistaken beliefs about Countrywide's financial condition.

60.     On or about August 13, 2007, Merrill Lynch & Co. issued an analyst report identifying the danger inadequate liquidity posed to Countrywide (emphasis added):

CFC currently has about $185B in available credit facilities, though the concern is that these facilities could be terminated or the terms changed meaningfully, thus impacting CFC's ability to operate normally. **We cannot understate the importance of liquidity for a specialty finance company like CFC.** If enough financial pressure is placed on CFC or if the market loses confidence in its ability to function properly then the model can break, leading to an effective insolvency. If liquidations occur in a weak market, **then it is possible for CFC to go bankrupt.**

61.     On or about August 15, 2007, several analysts downgraded Countrywide. Merrill Lynch & Co. downgraded Countrywide from "buy" to "sell" because of the threat inadequate liquidity posed to Countrywide.

14

62.    On or about August 23, 2007, Mozilo was interviewed on CNBC. In this interview, Mozilo denounced the Merrill Lynch & Co. analysis of Countrywide as "baseless" and "irresponsible" and denied that Countrywide faced bankruptcy. Among other things, Mozilo said the following (emphasis added):

> "One is the - just the irresponsible behavior on the part of that analyst from Merrill Lynch. To yell fire in a very crowded theater, in an environment where you had, you know, panic already setting in in the overall markets unrelated to Countrywide, was totally **irresponsible and baseless**, and it affected the lives of 61,000 people here at Countrywide, our employees, and more importantly or as important, our depositors. Our depositors are primarily senior citizens, who stood on-line, frightened to death that Countrywide was going to go bankrupt, to withdraw their money. **It was all caused by that individual at Merrill Lynch and had no basis in fact whatsoever. We have a very strong bank, well overcapitalized, access to the Fed window, for whatever they need.**"

> "Well, I can't categorically say – no company can say they can avoid bankruptcy because no company can be guaranteed they can't go bankrupt, but I can tell you that **there is no more chance for bankruptcy today for Countrywide than there was six months ago, a year ago, two years ago, and when the stock was $45 a share. We are a very solid company.**"

63.    Defendant Mozilo's statements on the August 23, 2007, CNBC interview were materially false and misleading when made because, as Mozilo knew, liquidity had disappeared three weeks earlier and Countrywide had ceased to be viable in July 2007.

64.    Defendant Mozilo failed to disclose in this CNBC interview that liquidity had disappeared or that Countrywide had ceased to be a viable company, thus omitting material facts peculiarly in the Countrywide Defendants' knowledge and not readily available to Plaintiff, even though, as a result of their misrepresentations and omissions, the Countrywide Defendants knew that Plaintiff was operating under mistaken beliefs about Countrywide's financial condition.

65.    In reliance on the above misrepresentations and omissions, Plaintiff purchased more than 10.5 million shares of Countrywide common stock in the 3 weeks following Defendant Mozilo's CNBC interview and retained its existing Countrywide investment.

15

66.    Had the Countrywide Defendants revealed the truth about Countrywide's financial condition, SRM could have investigated the danger to Countrywide's business from Countrywide's inadequate capital and liquidity. Plaintiff could also have investigated what efforts, if any, Defendants were making to address Countrywide's failure as a viable company. Plaintiff would have relied on the results of this investigation in deciding whether to hold or sell their Countrywide investment. In actuality, the Countrywide Defendants' material misrepresentations and omissions denied Plaintiff the opportunity to investigate Countrywide's problems and the efforts, if any, Countrywide was taking to address them.

67.    Had the Countrywide Defendants revealed the truth about Countrywide's financial condition, SRM would not have increased its investment in Countrywide and would have sold all or a substantial portion of its Countrywide investment.

68.    On or about August 23, 2007, Bank of America invested approximately $2 billion in Countrywide, purchasing Countrywide convertible preferred stock.

69.    In connection with its August 2007 investment in Countrywide, Bank of America performed due diligence that revealed that liquidity had disappeared in August 2007 and that Countrywide had ceased to be viable in July 2007.

70.    On October 26, 2007, Countrywide issued a press release and filed a Form 8-K announcing Countrywide's financial results for the third quarter of 2007, which included a quarterly loss of $1.25 billion, or $2.85 per share, Countrywide's first quarterly loss in 25 years. Countrywide also disclosed a $1 billion write-down of its loans and mortgage-backed securities and a threefold increase in loan loss provisions over the prior quarter (a nearly 25-fold increase over the prior year).

71.    In an effort to bolster Countrywide's stock price in the face of these partial corrective disclosures, the Countrywide Defendants made further fraudulent statements on the same day, designed to dampen the effect of the bad financial news disclosed in the October 26, 2007 press release and 8-K.

72.    For example, in Countrywide's press release attached to its October 26, 2007 8-K, Defendant Mozilo stated that during the third quarter, Countrywide "laid the foundation for a return to profitability in the fourth quarter" and "anticipate[d] that the Company will be profitable in the fourth quarter and in 2008," claiming that Countrywide had "stabilized its liquidity" and "strengthened its capital position" during the third quarter.

73.    Plaintiff read these materially false and misleading representations in Countrywide's October 26, 2007 8-K and relied on them in Plaintiff's analysis of Countrywide and in deciding to retain and increase its Countrywide investment.

74.    Also on October 26, 2007, during Countrywide's Q3 2007 Earnings Call, Defendants Mozilo, Sambol and Sieracki misled the investing public, including SRM, as to Countrywide's financial condition (emphasis added):

- **Mozilo:** "During the quarter we incurred a loss, the first quarterly loss in 25 years or approximately 100 consecutive quarters.  The loss was primarily attributable to the extraordinary volatile market conditions that we experienced during the quarter.  However as you've seen from our press release this morning, **we expect to return to profitability in the fourth quarter and we anticipate that 2008 will also be profitable.**"

- **Mozilo:** "In terms of our model, I think our model was one that has demonstrated that was able to be sustained during the most difficult period ever seen in my business life.  We are the only survivor of any major mortgage Company in the United States.  **And I think the fact that we survived and nobody else did, and we came out of it as Eric pointed out with more liquidity and more capital than we have had in the past, is a testimony to our model or more so a testament to the management team,** and that is my view of it."

- **Sambol: "The Company has sufficient capital, liquidity and financing capacity for its operating needs and its growth needs.** And coming through this environment CFC continues to possess all of its key historical competitive advantages, our management team with the experience and expertise, our distribution network, our fulfillment model, product breadth, technology and the Company's central focus on real estate finance. **And then, lastly, we want to convey that we believe that we are very well positioned for continued growth when this downcycle begins to turn around."**

- **Sambol: "The Company has ample and growing liquidity.** Importantly, we no longer have or plan to have any reliance on the commercial paper markets for funding. We successfully and quickly, as I mentioned, reversed the short period of deposit outflows as a result of our campaign and in fact retail deposits since then have been growing at a record pace in September and October. **The Company is well capitalized with significant equity to support our operating needs as well as our balance sheet growth plans.** Our new thrift model and capital structure will lessen our risks and enhance our competitiveness going forward relative to funding costs and operating efficiencies and we will now be able to fully enjoy the benefits that many of our competitors -- large bank competitors do relative to federal preemption. We have a deep and experienced executive team to manage through this transitional period and, again, we believe **that we are well positioned to capitalize on the recovery in the housing market when it happens and also on opportunities that we believe will surface as a result of market dislocations."**

- **Sambol: "Numerous of our competitors have exited the origination market and more are expected to exit in the coming months. Countrywide anticipates that as a result we will grow our market share in the more profitable retail and wholesale channel through 2008."**

- **Sambol: "So long-term we see a growing market with strong underlying demographic and other drivers of market growth and we also see compelling long-term share growth prospects for the Company as a result of rapid industry consolidation."**

- **Sambol: "In concluding our prepared remarks -- thank you, Eric -- again, I want to just summarize the message that we were hoping to impart in this presentation, and that is that Countrywide has successfully managed the recent environmental challenge. The Company's liquidity is stable and improving. We have strong capital adequacy.** Our new business and funding model is expected to reduce risk prospectively. We have begun and taken the steps to right-size the Company for lower production volume. Importantly, Q3 is expected to be a trough quarter, and we expect profitability to resume as we have said in Q4 and throughout 2008. **Countrywide, we expect will be a major beneficiary of industry consolidation and we are,**

**we believe, well-positioned to exploit consolidation and well-positioned for future growth**…. But really most importantly, I think the message that we will convey is that while we certainly hope that **we don't see another market stress event like we did in the third quarter, it is very much the case that we are much more prepared and in better shape should one come.**"

- **Sambol:** "Well, you know, what you should know, Fred, is that our strategy over the course of the quarter, including through today – and it is a strategy that will likely subside -- is that **we have been motivated to expand liquidity dramatically. To source liquidity from all available sources we felt was the smart thing to do in an environment of uncertainty and stress such as we are in. That liquidity has not been cheap in the near term. We expect as things normalize here, hopefully very quickly, that you will see that reflected in our pricing and deposits, and the cost of incremental liquidity will go down.**"

- **Sieracki: "We now have ample and growing funding liquidity, and our current focus is on growing contingent liquidity at the bank."**

- **Sieracki:** "I mentioned earlier we have ample and growing contingent liquidity at the bank to fund operating and growth needs, and to manage potential future stresses. There may be additional shoes to drop. The mortgage company has adequate liquidity to fund all debt maturities through 2008, without raising any new debt."

- **Sieracki: Question from analyst Jay Weintraub: "You have said in the** past that you hold liquidity sufficient to pay all of your maturing obligations through the end of 2008, I believe. Could you confirm that that is still the case?" **Answer from Defendant Sieracki:** "Hello, Jay. That comment was made with respect to CHL, our mortgage company. **The bottom line is that we do have sufficient cash on hand and liquidity to service all debt through the end of 2008 that would contemplate sales of some nonagency products.**"

75.    On that same call Defendant Mozilo said: "[Y]ou have to make a determination whether or not you think that Countrywide is a worthy investment for you and will fulfill your investment objectives, both on a personal level and as a money manager. We just present the story. Your decision to buy or sell is yours." In fact, however, Mozilo's and other Countrywide Defendants' misrepresentations and omissions undermined Plaintiff's ability to make an investment decision based on Countrywide's true financial condition.

76.     Indeed, all of the representations as to Countrywide's business and prospects during the Q3 2007 earnings call were materially false and misleading when made because, as the Countrywide Defendants knew, Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared on August 2, 2007.

77.     The Countrywide Defendants breached their duty to disclose the truth by failing to disclose that Countrywide had ceased to be viable and was undergoing a liquidity crisis, omitting material facts which were peculiarly within their knowledge and was not readily available to Plaintiff. The Countrywide Defendants failed to disclose these material facts despite the fact that they knew that, as a result of their misrepresentations and omissions, Plaintiff was acting under mistaken beliefs about Countrywide's financial condition, including its viability and liquidity.

78.     Countrywide Defendants' materially false and misleading statements in Countrywide's October 26, 2007 press release and 8-K and during Countrywide's Q3 2007 Earnings Call managed to blunt the impact of and temporarily overwhelm the bad financial news revealed in Countrywide's press release and 8-K, reassuring the investing public and artificially inflating the price of Countrywide's stock, which rose more than 32% to close at $17.30.

79.     On November 9, 2007, Countrywide filed its Q3 2007 Form 10-Q, which represented that Countrywide had successfully managed the liquidity risk associated with current market conditions:

> We have contingency planning protocols for funding liquidity that were designed to encompass a wide variety of market conditions. We place major emphasis on the adequacy, reliability and diversity of our funding sources.
>
> Starting in the second quarter, funding liquidity in the financial services sector was constrained primarily due to changes in secondary mortgage market investor demand. During the third quarter, this condition worsened and expanded to

include the debt markets we have traditionally relied upon to meet our short-term funding needs.

As discussed in the preceding section under *Liquidity and Capital Resources*, we have adjusted our operations and financing sources to adapt to the current market conditions, including accessing other pre-existing funding liquidity sources, procuring new sources and accelerating the integration of our mortgage company with the Bank. As a result of this accelerated integration, a significantly higher percentage of our mortgage banking fundings are occurring in the Bank sooner than originally planned. The Bank has significant liquidity sources available to fund our mortgage banking operations. While we believe we have adequate funding liquidity, the effect of future developments on the Company may require us to make additional operational adjustments and/or procure additional sources of financing.

80.    These claims in Countrywide's Q3 2007 10-Q were materially false and misleading when made because liquidity had disappeared in August 2007 and Countrywide had ceased to be a viable company in July 2007.

81.    Countrywide's Q3 2007 10-Q failed to disclose that liquidity had disappeared in August 2007 or that Countrywide had ceased to be a viable company in July 2007, omitting material facts peculiarly in the Countrywide Defendants' knowledge and not readily available to Plaintiff, even though, as a result of their misrepresentations and omissions, the Countrywide Defendants knew that Plaintiff was operating under mistaken beliefs about Countrywide's financial condition.

82.    On or about November 30, 2007, senior representatives from SRM spoke by telephone with David Bigelow ("Bigelow") and Lisa Riordan ("Riordan") in Investor Relations for Countrywide.   During this conversation, SRM asked about Countrywide's liquidity. Bigelow and Riordan, on behalf of Countrywide, reaffirmed the representations made by the Countrywide Defendants in the Q2 2007 and Q3 2007 earnings calls.

83.    On or about December 3, 2007, Defendant Mozilo represented in an interview on CNBC that Countrywide had "adequate liquidity and capital" and was "a strong, viable financial company."

84.    These claims in Mozilo's CNBC interview were materially false and misleading when made because liquidity had disappeared in August 2007 and Countrywide had ceased to be a viable company in July 2007, as Mozilo knew and later admitted to Plaintiff.

85.    In his CNBC interview, Mozilo failed to disclose that liquidity had disappeared in August 2007 or that Countrywide had ceased to be a viable company in July 2007, and thus omitted material facts peculiarly in the Countrywide Defendants' knowledge and not readily available to Plaintiff.

86.    On or about December 28, 2007, Ian Barclay ("Barclay"), John Myers ("Myers") and Jon Wood ("Wood") from SRM had a call with Bigelow and Sieracki.

87.    During the call, Bigelow and Sieracki confirmed to Barclay, Myers and Wood, *inter alia*, Countrywide's public statements regarding Countrywide's financial condition, liquidity and capital reserves.

88.    Among other things, Bigelow and Sieracki told Plaintiff that Countrywide had sufficient liquidity to last for twelve months.

89.    Bigelow's and Defendant Sieracki's statements on the call with Plaintiff were materially false or misleading when made because Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared in early August 2007.

90.    Bigelow and Sieracki failed to disclose that liquidity had disappeared or that Countrywide had ceased to be a viable company, omitting material facts not readily available to Plaintiff despite the fact that Bigelow and Defendant Sieracki knew that, as a result of the

Countrywide Defendants' misrepresentations and omissions, Plaintiff was acting under mistaken beliefs with respect to Countrywide's financial condition, including its viability and liquidity.

91.     In reliance on the misrepresentations and omissions set forth above, Plaintiff purchased over 8.4 million shares of Countrywide common stock over the following two weeks and retained its existing Countrywide investment.

92.     Had the Countrywide Defendants revealed the truth about Countrywide's financial condition, SRM could have investigated the danger to Countrywide's business from the disappearance of liquidity and what efforts, if any, the Countrywide Defendants were making to address Countrywide's ceasing to be viable.  Plaintiff would have relied on the results of this investigation in deciding whether to hold or sell their Countrywide investment.  In actuality, the Countrywide Defendants' material misrepresentations and omissions denied Plaintiff the opportunity to investigate Countrywide's problems and the efforts, if any, Countrywide was taking to address them.

93.     Had the Countrywide Defendants revealed the truth about Countrywide's financial condition, SRM would have sold all or a substantial portion of its Countrywide investment.

94.     In or about early January 2008, there were rumors that Countrywide was bankrupt as the truth about Countrywide's financial condition was leaking into the market.

95.     On January 8, 2008, Countrywide issued a statement saying that there was "no substance to the rumor that Countrywide is planning to file for bankruptcy, and we are not aware of any basis for the rumor that any of the major rating agencies are contemplating negative action."

96.     On the basis of Countrywide's repeated assurances as to the adequacy of its capital and liquidity made both in public statements and directly to Plaintiff through personal communications, SRM discounted these bankruptcy rumors and purchased additional shares of Countrywide stock in or about early January 2008.

97.     On January 11, 2008, Countrywide signed an agreement to be acquired by Bank of America in exchange for approximately $4 billion in stock.

98.     On January 14, 2008, Defendant Lewis spoke in support of the merger, telling the investing public on behalf of Bank of America that Countrywide's bankruptcy was just "a malicious rumor" and that Countrywide "had a very impressive liquidity plan; they had their backup lines in place," a conclusion reached, Lewis said, after Bank of America had conducted twice as much due diligence as it ordinarily might have, "with twice as many people."

99.     Lewis's representations regarding Countrywide's financial condition and liquidity were materially false and misleading when made because, as the Bank of America Defendants knew, or were reckless in not knowing, liquidity had disappeared in August 2007 and Countrywide had ceased to be viable in July 2007.

100.     Having conducted an extensive investigation into Countrywide in connection with the Bank of America's merger with Countrywide, Bank of America and Lewis knew, or were reckless in not knowing, Countrywide's true financial condition, including its viability and liquidity.

101.     Despite his knowledge of the truth, Lewis misrepresented and concealed Countrywide's financial condition in order, among other things, to protect Bank of America's August 2007 investment of $2 billion in Countrywide, which would have been jeopardized by

Countrywide's collapse, and to protect his plan to grow Bank of America by acquiring the nation's leading home loan originator and servicer.

102.   Defendant Lewis failed to disclose in his January 14, 2008 statements or thereafter that liquidity had disappeared or that Countrywide had ceased to be a viable company months earlier, omitting material facts peculiarly in the Defendants' knowledge and not readily available to Plaintiff. Defendant Lewis failed to disclose these material facts despite his knowledge that, as a result of Defendants' misrepresentations and omissions, Plaintiff was operating under mistaken beliefs concerning Countrywide's financial condition, including its viability and liquidity.

103.   The Bank of America Defendants intended that Plaintiff rely on their misrepresentations and omissions, thereby causing Plaintiff to retain its Countrywide investment, desist from further inquiry and remain passive.

104.   Had Bank of America or Lewis revealed the truth about Countrywide's financial condition, SRM could have investigated the danger to Countrywide's business from the disappearance of liquidity and what efforts, if any, Defendants were making to address Countrywide's ceasing to be viable. Plaintiff would have relied on the results of this investigation in deciding whether to hold or sell their Countrywide investment. In actuality, Lewis's material misrepresentations and omissions denied Plaintiff the opportunity to investigate Countrywide's problems and Defendants' efforts, if any, to address them.

105.   Had Bank of America or Lewis revealed the truth about Countrywide's financial condition, Plaintiff would not have increased its investment in Countrywide and would have sold all or a substantial portion of its Countrywide investment.

106.    In reliance on the misrepresentations and omissions by the Bank of America Defendants, Plaintiff purchased over 21.5 million shares of Countrywide stock in the ten days following Lewis's January 14, 2008 statements and retained the common shares it already held.

107.    The agreed price of approximately $4 billion was less than 30% of Countrywide's reported book value.  Defendant Lewis called it "a steal."

108.    In Plaintiff's view, the agreed price for Bank of America's acquisition of Countrywide was too low, given the Countrywide Defendants' repeated reassurances in public statements and directly to Plaintiff regarding Countrywide's financial condition.  As Plaintiff noted in a press release on or about January 31, 2008, "the acceptance by [Countrywide] of the proposed terms [of the Bank of America acquisition] is inconsistent with statements made by [Countrywide] and its officers in the fourth quarter of 2007."

109.    In reliance on statements by the Countrywide Defendants' and by Lewis regarding Countrywide's financial condition, SRM believed that Countrywide's shareholders would vote to reject Bank of America's merger offer.  SRM expected that Countrywide's stock price would then rise to reflect what Defendants' representations had led SRM to believe was Countrywide's true value.  Accordingly, in or about late January 2008, SRM retained its shares of Countrywide stock and purchased additional Countrywide stock.

110.    On January 31, 2008, SRM filed a Schedule 13D with the SEC in which SRM disclosed holdings of over 30 million shares of Countrywide and indicated, *inter alia*, its intention to initiate discussion with Countrywide's executive management and board of directors. SRM confirmed this intention in a press release on or about that same date.

111.    However, when SRM sought to speak with Countrywide's senior management, including Defendants Mozilo, Sambol and Sieracki, Countrywide told Plaintiff that senior management was not available for any meetings with investors.

112.    On February 29, 2008, Countrywide filed its Form 10-K for 2007, in which Countrywide continued to tout its Liquidity Management Plan:

> We have developed a comprehensive Liquidity Management Plan ("LMP") to moderate liquidity risk with the goal of maintaining adequate, appropriate and cost-effective sources of liquidity under all market conditions. A key element of the LMP is the requirement that we maintain sufficient sources of contingent liquidity to fund our business in the event of market disruptions of varying severities and duration. Contingent liquidity sources include credit facilities or financing programs under which our creditors are committed to fund in a stressed environment or are otherwise deemed to be reliable. They also include highly liquid, unencumbered assets that can be converted to cash, via sale or financing, within 30 days.
>
> Another key element of the LMP is to finance our assets in a manner consistent with their liquidity profile. Liquid assets are those that can be liquidated within 30 days under all market conditions by sale (at prices no less than values reported on our balance sheet prepared in accordance with generally accepted accounting principles) or are readily able to be financed. These assets primarily consist of mortgage loans held for sale, trading securities, available-for-sale securities and warehouse advance lines. Liquid assets are financed using a combination of committed warehouse financing programs including unsecured and secured revolving lines of credit, federal funds, repurchase agreements and short-term deposits.
>
> Less liquid assets are those that are not readily saleable into active markets or, as in the case of our investments in mortgage loans, are not intended to be sold. These assets primarily consist of mortgage loans held for investment, MSRs ["mortgage servicing rights"] and retained interests. Less liquid assets are financed with long-term capital, which we define for this purpose as equity and debt, including long-term deposits, with a maturity greater than six months.
>
> We regularly forecast our potential operating cash needs over a rolling twelve-month horizon, taking into account, among other things, loan commitments, debt maturities and potential peak balance sheet levels under several interest rate scenarios. We also forecast our potential operating cash needs in various stress scenarios to determine our contingent liquidity needs. Based on these forecasts, we size our existing financing programs and, if necessary, establish new ones to meet expected future operating cash requirements. The forecasts are also used to

size our contingent liquidity sources, which are credit facilities or financing
programs under which our creditors are committed to fund or depositors
are expected to participate.

\* \* \*

We believe that we have adequate liquidity to meet our obligations, including—
but not limited to—our commitments to lend, maturities of debt and obligations to
fund rapid amortization events. At December 31, 2007, we estimate that we have
available liquidity totaling $36.6 billion. We classify a facility as reliable when
the facility is provided by a government-sponsored enterprise or when it is
contractually committed to us and we have paid a commitment fee in exchange
for the facility. While current market conditions present challenges to us, the
funding structure that we have migrated toward has allowed us to change our
sources of funding away from those that have higher refinancing risk toward more
stable and reliable sources such as deposits and FHLB [Federal Home Loan Bank
of Atlanta] advances. We supplement these sources with committed secured and
unsecured revolving credit facilities provided by highly rated banks.

113.    The Countrywide Defendants had been making similar representations since at

least as early as March 1, 2007 when Countrywide filed its Form 10-K for 2006, in which the

Countrywide Defendants represented that Countrywide had implemented a Liquidity

Management Plan which would "ensure that [Countrywide] maintain[ed] adequate, appropriate

and cost-effective sources of liquidity under all market conditions." As the Countrywide

Defendants knew, or were reckless in not knowing, and as was borne out by subsequent events,

this representation was materially false and misleading when made.

114.    Countrywide's 2007 10-K again represented that Countrywide had successfully

managed the liquidity risk associated with current market conditions:

We have contingency planning protocols for funding liquidity that were designed
to encompass a wide variety of market conditions. We place major emphasis on
the adequacy, reliability and diversity of our funding sources.

\* \* \*

As discussed in the section *Liquidity and Capital Resources*, we have adjusted our
operations and financing sources to address the current market conditions,
including accessing other pre-existing funding liquidity sources, procuring new

sources and accelerating the integration of our mortgage company with the Bank. The Bank has significant liquidity sources available to fund our mortgage banking operations. While we believe we currently have adequate funding liquidity, the effect of future developments on the Company may require us to make additional operational adjustments and/or procure additional sources of financing.

115.    These claims in Countrywide's 2007 10-K were materially false and misleading when made because Countrywide was in financial crisis, liquidity had disappeared in August 2007 and Countrywide had ceased to be a viable company in July 2007, as Defendants Mozilo and Sambol later admitted to Plaintiff.

116.    Countrywide's 2007 10-K failed to disclose that Countrywide was in financial crisis, that liquidity had disappeared or that Countrywide had ceased to be a viable company months before, omitting material facts peculiarly in the Countrywide Defendants' knowledge and not readily available to Plaintiff, despite the fact that the Countrywide Defendants knew that, as a result of Defendants' misrepresentations and omissions, Plaintiff was operating under mistaken beliefs regarding Countrywide's financial condition, including its viability and liquidity.

117.    Plaintiff read these materially false and misleading representations in Countrywide's 2006 and 2007 Form 10-K filings and relied on them in its analysis of Countrywide and in deciding to retain and increase its Countrywide investment.

118.    On April 23, 2008, Defendant Lewis reiterated the message of his January 14, 2008 statements in a speech at Bank of America's annual meeting of shareholders, stating "the deep due diligence we performed confirmed our belief that there is great long-term value embedded in Countrywide's business."

119.    Lewis's representations regarding Countrywide were materially false and misleading when made because, as the Bank of America Defendants knew, or were reckless in

not knowing, liquidity had disappeared in August 2007 and Countrywide had ceased to be viable in July 2007.

120.    Having conducted an extensive investigation ("deep due diligence") into Countrywide in connection with the Bank of America's merger with Countrywide, Bank of America and Lewis knew, or were reckless in not knowing, Countrywide's true financial condition, including its viability and liquidity.

121.    On May 12, 2008, Countrywide filed its Q1 2008 Form 10-Q with the SEC, which again represented that Countrywide had successfully managed the liquidity risk associated with current market conditions:

> We have contingency planning protocols for funding liquidity that were designed to encompass a wide variety of market conditions. We place major emphasis on the adequacy, reliability and diversity of our funding sources.
>
> * * *
>
> As discussed in the section *Liquidity and Capital Resources*, we have adjusted our operations and financing sources to address the current market conditions, including accessing other pre-existing funding liquidity sources, procuring new sources and the integration of our Mortgage Banking Operations into the Bank. While we believe we currently have adequate funding liquidity, the effect of future developments on the Company may require us to make additional operational adjustments and/or procure additional sources of financing.

122.    These representations in Countrywide's Q1 2008 10-Q were materially false and misleading when made because liquidity had disappeared and Countrywide had ceased to be a viable company months earlier.

123.    Countrywide's Q1 2008 10-Q failed to disclose that liquidity had disappeared or that Countrywide had ceased to be a viable company, omitting material facts peculiarly in the Countrywide Defendants' knowledge and not readily available to Plaintiff.

124.    After months of trying, Plaintiff finally met with Defendants Mozilo, Sambol and Sieracki in New York on or about June 3, 2008.  Barclay, Myers and Wood attended the meeting on behalf of Plaintiff.

125.    At that meeting, Defendant Mozilo told Plaintiff that Countrywide had gone from being a viable company to being not viable during one week nearly a year before, in July 2007.

126.    Defendant Sambol told SRM that liquidity disappeared in one day on August 2, 2007.

127.    Mozilo told Plaintiff that if Plaintiff did not vote for the merger with Bank of America, then there was a good chance that Countrywide would not survive.  Mozilo said that the banks that provided financing facilities to Countrywide would attempt to foreclose if Countrywide made any "slip."

128.    Defendant Sambol told Plaintiff that if the merger with Bank of America was not approved, each of three ratings companies have said they will downgrade Countrywide to "junk."  Sambol told Plaintiff that this would likely lead to a run on the bank.

129.    Sambol told Plaintiff that on Countrywide's balance sheet there was $30 billion in maturing debt and that, by the end of 2008, in order to satisfy these maturities, Countrywide would have to sell assets.  The problem, Sambol explained, was that Countrywide would not be able to use its assets to cover these obligations because the assets available were non-conforming agency loans.  Sambol said that these loans would be difficult to sell or borrow against.

130.    Sambol told Plaintiff that Countrywide needed far more than a $5 billion infusion of capital even to retain an investment-grade rating.

131.   On the basis of this belated disclosure of Countrywide's true financial condition by Defendants Mozilo, Sambol and Sieracki, Plaintiff concluded that a successful challenge to Bank of America's offer could not be made.

132.   As a result, beginning on or about June 24, 2008, Plaintiff sold its Countrywide stock for an average price of approximately $4.50 per share, suffering substantial losses on its Countrywide investment.

## ADDITIONAL SCIENTER ALLEGATIONS

### Countrywide Defendants' Scienter

133.   As alleged herein, each of the Countrywide Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in Countrywide's name were materially false and misleading when made, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities law and common law of the State of New York.

134.   The Individual Countrywide Defendants had the opportunity to commit and to participate in the wrongful conduct complained of herein.  Each was a senior executive officer and/or director of Countrywide and thus controlled the information disseminated to the investing public in Countrywide's press releases, SEC filings and communications with analysts and investors, including directly to Plaintiff.  As a result, each could falsify the information that reached the public about Countrywide's business and performance.

**Angelo R. Mozilo**

135.    As Chairman of the Board and Chief Executive Officer of Countrywide,

Defendant Mozilo participated in the issuance of, signed and certified Countrywide's materially

false and misleading SEC filings, as required by Sarbanes-Oxley, issued throughout the relevant

period.

136.    Specifically, in connection with Countrywide's Form 10-K for 2006 and 2007 and

the Form 10-Q for all quarters of 2007 and the first quarter of 2008, Mozilo certified that he had

put in place disclosure controls and procedures to ensure the accuracy of Countrywide's filings,

and that he had:

> Designed such disclosure controls and procedures, or caused such disclosure
> controls and procedures to be designed under our supervision, to ensure that
> material information relating to the registrant, including its consolidated
> subsidiaries, is made known to us by others within those entities, particularly
> during the period in which this report is being prepared[.]

137.    Also in connection with Countrywide's Form 10-K for 2006 and 2007 and the

Form 10-Q for all quarters of 2007 and the first quarter of 2008, Mozilo certified that he had:

> Designed such internal control over financial reporting, or caused such internal
> control over financial reporting to be designed under our supervision, to provide
> reasonable assurance regarding the reliability of financial reporting and the
> preparation of financial statements for external purposes in accordance with
> generally accepted accounting principles[.]

138.    The above disclosure controls, together with his position as Countrywide's Chief

Executive Officer, meant that throughout the relevant period Mozilo knew, or was reckless in not

knowing, Countrywide's true financial condition, including its viability and liquidity.

139.    Further, Countrywide's Finance Committee, which met regularly in 2006 and

2007, reported to Countrywide's Board of Directors (of which Mozilo was Chairman) and was

responsible for reviewing, assessing and monitoring Countrywide's activities with respect to the following finance and market risk related matters, among others:

- Capital structure, liquidity, capital adequacy, reserves and related matters;

- Long-term financing strategy and plans, including (i) projected levels of short- and long-term borrowing and credit line requirements; (ii) projected levels of equity or hybrid securities issuances; and (iii) other financing vehicles;

- Countrywide's Liquidity Policy and Finance Transactions Policy, the CFC Cash Dividend Policy, and other policies relating to Countrywide's liquidity management and capital structure;

- Capital budget, including a review of consistency between the budget and the financial plans;

- Market risk policies including those relating to interest rate risk;

- Short- and long-term investment strategy, investment and investing policies, and investments and assets held by Countrywide and its significant subsidiaries, including mortgage service rights and other retained interests; and

- Mortgage loan sales and securitizations, and Countrywide's secondary marketing objectives, strategies, policies, procedures and controls related to such activities.

140.    The Finance Committee also reviewed matters related to equity purchases, taking into account the quantity and quality of consolidated assets, earnings, potential earnings, availability of retained earnings, projected growth rates, liquidity and capital requirements and such other matters that the Committee deemed appropriate.

141.    Defendant Mozilo, by virtue of his position on the Countrywide Board of Directors, to which Countrywide's Finance Committee reported, knew, or was reckless in not knowing, Countrywide's true financial condition, including its viability and liquidity.

142.    As alleged herein, throughout the relevant period, Defendant Mozilo made a number of materially false and misleading statements regarding Countrywide's true financial

condition, including its viability and liquidity, which Defendant Mozilo knew, or was reckless in not knowing, were materially false or misleading when made.

143.    In addition, during the relevant period Defendant Mozilo was motivated to misrepresent the public material facts about Countrywide's true financial condition in order to keep Countrywide's stock price artificially high while he sold his own shares at a profit.

144.    Notwithstanding Defendant Mozilo's duty not to sell Countrywide common stock under these circumstances, or to disclose the non-public, inside information prior to selling their stock, Defendant Mozilo sold Countrywide stock during the relevant period at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

145.    During the relevant period, Mozilo sold nearly six million shares of Countrywide stock at prices which Defendants' misrepresentations and omissions caused to be artificially inflated, resulting in proceeds to Mozilo of over $200 million.

146.    Mozilo sold his Countrywide stock pursuant to a 10b5-1 plan which he changed three times in fourteen weeks:  On or about October 27, 2006, then again on or about December 12, 2006 and yet again on or about February 2, 2007.  With each modification, Mozilo increased the number of shares he was authorized to sell.

147.    Mozilo gave final approval to his October 27, 2006 10b5-1 plan during a meeting with his financial advisor on September 25, 2006.

148.    On the morning of that same day, Mozilo met with Defendant Sambol to discuss Countrywide's pay-option adjustable rate mortgage loan portfolio.

149.    The next day, September 26, 2006, Mozilo sent an email to Defendants Sambol and Sieracki in which Mozilo said (emphasis added):

**[w]e have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet.** The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico. In my judgement, as a long time lender, I would always trade off fico for equity. The bottom line is that **we are flying blind** on how these loans **will perform in a stressed environment of higher unemployment, reduced values and slowing home sales.**

150.    In that same email, Mozilo further stated that **"pay options are currently mispriced in the secondary market, and that spread could disappear quickly** if there is an foreseen [sic] headline event such as another lender getting into deep trouble with this product or because of negative investor occurance [sic]." (emphasis added).

151.    The Countrywide Defendants never disclosed the material information in Mozilo's September 26, 2006 email to the investing public.

152.    Mozilo knew, or was reckless in not knowing, that his representations concerning Countrywide's financial condition, including its viability and liquidity, were false and misleading when made. Among other things, Mozilo knew that Countrywide was "flying blind" with respect to the value of its substantial pay-option adjustable rate mortgage loan portfolio and thus knew that Countrywide's true financial condition was precarious and that he had no reasonable basis for his assurances about Countrywide's financial condition.

153.    Mozilo approved his October 27, 2006 10b5-1 plan while in possession of this material, non-public information.

154.    Under the third modification of his 10b5-1 plan, on or about February 2, 2007, Mozilo increased his authorized sales to 580,000 shares per month. This modification came less than a month before Countrywide filed its 2006 10-K (certified by Mozilo), which falsely and misleadingly reassured investors that Countrywide's Liquidity Management Plan would "ensure

that [Countrywide] maintain[ed] adequate, appropriate and cost-effective sources of liquidity under all market conditions."

155.    Mozilo's stock sales during the relevant period were highly unusual and out of line with his prior trading practices. During this period Mozilo sold a much higher volume of shares and generated much greater proceeds than previously.

156.    For example, in the year after he adopted his October 27, 2006, 10b5-1 plan, Defendant Mozilo sold approximately 5,789,579 shares of Countrywide stock, generating proceeds of approximately $206,171,989. In comparison, in the year before he adopted that plan, Defendant Mozilo sold approximately 2,278,964 shares of Countrywide stock, generating proceeds of approximately $81,965,840. That is, Mozilo's sales of Countrywide stock in the year after he adopted his October 27, 2006 plan, which includes the period during which liquidity disappeared and Countrywide ceased to be a viable company, were more than 250% of his sales in the year before and generated more than 250% of the proceeds of his previous year's sales.

157.    Mozilo misrepresented and concealed the circumstances of his unusually heavy stock sales in statements to the investing public. During Countrywide's earnings conference call on July 24, 2007 for the Q2 2007, Mozilo asserted that his stock sales were made pursuant to a 10b5-1 plan established "well over a year ago." On that same call Mozilo stated that he was selling only "options with expiration dates."

158.    Both of these representations, as Mozilo knew, were false. First, Mozilo's 10b5-1 plan had been modified to increase his authorized sales less than five months before, not "well over a year." Second, Countrywide's 2006 and 2007 annual proxy statements on Schedule 14A

reflect a sale of more than 250,000 shares Mozilo owned outright, 20% of Mozilo's holdings, between April 2006 and April 2007.

159.    Mozilo further misrepresented and concealed the circumstances of his stock sales by means of a statement through Countrywide's Chief Legal Officer, Sandy Samuels, that the February 2, 2007, 10b5-1 plan revision was "made in response to the terms of Mozilo's employment agreement struck Dec. 22."

160.    However, Samuel's statement on behalf of Mozilo was false.  As Countrywide's Form 8-K filed October 24, 2006 makes clear, the terms of Mozilo's new employment agreement were established by October 20, 2006 – *before* Mozilo entered into the first of his three 10b5-1 plan changes.  His employment agreement therefore provided no basis for the December 2006 or February 2007 changes which increased his authorized sales by hundreds of thousands of shares per month.

161.    In fact, Mozilo's 2006 employment agreement reflected Mozilo's decision to *defer* retirement, which thus extended the time period available for Mozilo to liquidate his holdings before retirement and *reduced* the size of the monthly sales required to accomplish that goal.  As set forth above, this is just the opposite of Mozilo's actual behavior in *increasing* his monthly sales of Countrywide stock.

162.    Further, Mozilo increased his personal sales of Countrywide stock at the same time that he caused Countrywide to support its own stock price by repurchasing its own stock for the first time in its history.

163.    For example, Mozilo increased his authorized sales of Countrywide stock by modifying his 10b5-1 plan on October 27, 2006, just three days after Countrywide announced the

first stock buyback in its history on October 24, 2006. Mozilo then modified his 10b5-1 plan twice in quick succession to increase his authorized sales during this stock buyback.

164.    Mozilo's highly suspicious and unusual sales of Countrywide stock triggered an SEC investigation resulting in a recommendation by the SEC staff that Mozilo be charged with fraud. The SEC is expected to file these charges shortly.

165.    Moreover, Mozilo was motivated to misrepresent the public material facts about Countrywide's true financial condition in order to secure and maintain his extraordinary level of compensation. Mozilo received total compensation of $31.9 million in 2007, $48.1 million in 2006 and $22.9 million in 2005, based almost exclusively on Countrywide's reported financial performance.

166.    For example, Mozilo's $31.9 million in 2007 compensation included just $1.9 million in salary with Mozilo's receiving up to $10 million in incentive compensation based on Countrywide's return on equity and earnings, $10 million in performance-based restricted stock units. In 2006, Mozilo received over $20 million dollars in incentive awards and bonuses.

167.    Alternatively, Mozilo made his materially false and misleading statements through negligence.

**David Sambol**

168.    As President and Chief Operating Officer, Defendant Sambol participated in the issuance of and signed Countrywide's Form 10-K for 2007 and Form 10-Q for all quarters of 2007 and the first quarter of 2008, which contained materially false and misleading SEC filings issued throughout the relevant period.

39

169.    Sambol was also a member of the Executive Strategy Committee, which was composed of a handful of Countrywide's top executives and charged with Countrywide's day-to-day management.

170.    Defendant Sambol, by virtue of his position on the Countrywide Board of Directors, received the reports of Countrywide's Finance Committee. (*See* ¶ 139-140, above.)

171.    Sambol's position as President and Chief Operating Officer and as a member of Countrywide's Executive Strategy Committee and Board of Directors meant that throughout the relevant period Sambol was directly responsible for Countrywide's financials and knew, or was reckless in not knowing, Countrywide's true financial condition, including its viability and liquidity.

172.    For example, on September 26, 2006, Defendant Sambol received an email from Mozilo making clear that, among other things, Countrywide was "flying blind" on the value of its substantial portfolio of pay-option adjustable rate mortgage loans. Defendant Sambol thus knew, or was reckless in not knowing, that his representations concerning Countrywide's financial condition, including its viability and liquidity, were false and misleading when made because Countrywide's true financial condition was precarious and the Countrywide Defendants, including Sambol, had no reasonable basis for their assurances about Countrywide's financial condition. (*See* ¶¶ 149-150, above.)

173.    As alleged herein, Defendant Sambol made a number of materially false and misleading statements regarding Countrywide's true financial condition, including its viability and liquidity, which Defendant Sambol, as a result of his positions, responsibilities and access to information at Countrywide, knew, or was reckless in not knowing, were materially false or misleading when made.

174.    In addition, during the relevant period Defendant Sambol was motivated to misrepresent the public material facts about Countrywide's true financial condition in order to keep Countrywide's stock price artificially high while he sold his own shares at a profit.

175.    Notwithstanding Defendant Sambol's duty not to sell Countrywide common stock under these circumstances, or to disclose the non-public, inside information prior to selling their stock, Defendant Sambol sold Countrywide stock during the relevant period at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

176.    Defendant Sambol adopted a 10b5-1 plan pursuant to which he realized more than $1.3 million over the following two months as the result of sales of Countrywide stock at prices artificially inflated by the Countrywide Defendants' misrepresentations and omissions.

177.    Defendant Sambol's sales according this plan are suspicious because they were made pursuant to a Rule 10b5-1 plan adopted on May 20, 2007, just eleven days after he signed Countrywide's first quarter 2007 Form 10-Q which represented that Countrywide did "not expect the reduction in liquidity for nonprime loans to have adverse effects on [its] ability to effectively meet [its] financing requirements" and which reassured the investing public that Countrywide had "reliable sources of liquidity sized to meet a range of potential future funding requirements" and just three days before Countrywide's Fixed Income Investor Day in which Defendant Sambol reassured investors that "while the subprime correction did have a material impact on our first-quarter results, we've made all the necessary adjustments to provide for further profitability."

178.    From the fourth quarter 2006 through the third quarter 2007, Sambol realized more than $15 million from his sales of Countrywide stock.

179.    Moreover, Sambol was motivated to misrepresent the public material facts about Countrywide's true financial condition in order to secure and maintain his extraordinary level of compensation.  Sambol received total compensation of $19.3 million in 2007, $12.0 million in 2006 and $6.4 million in 2005, based almost exclusively on Countrywide's reported financial performance.

180.    For example, in 2007, Sambol received $1.4 million in salary, and up to $6.3 million in incentive compensation based on Countrywide's return on equity and net income and $9 million in performance-based restricted stock units.

181.    Alternatively, Sambol made his materially false and misleading statements through negligence.

**Eric P. Sieracki**

182.    As Executive Managing Director and Chief Financial Officer of Countrywide, Defendant Sieracki participated in the issuance of, signed and certified Countrywide's materially false and misleading SEC filings, as required by Sarbanes-Oxley, issued throughout the relevant period.

183.    Specifically, in connection with Countrywide's Form 10-K for 2006 and 2007 and the Form 10-Q for all quarters of 2007 and the first quarter of 2008, Sieracki certified that he had put in place disclosure controls and procedures to ensure the accuracy of Countrywide's filings, and that he had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]

184.    Also in connection with Countrywide's Form 10-K for 2006 and 2007 and the

Form 10-Q for all quarters of 2007 and the first quarter of 2008, Sieracki certified that he had:

> Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]

185.    These disclosure controls, together with his position as Countrywide's Chief

Financial Officer with responsibility for overseeing Countrywide's major financial departments,

including corporate accounting, treasury, financial planning, strategic planning and taxation and

serving as Countrywide's senior manager in the areas of investor relations, corporate

development and equity capital activities, meant that throughout the relevant period Sieracki

knew, or was reckless in not knowing, Countrywide's true financial condition, including its

viability and liquidity.

186.    For example, on September 26, 2006, Defendant Sieracki received an email from

Mozilo making clear that, among other things, Countrywide was "flying blind" on the value of

its substantial portfolio of pay-option adjustable rate mortgage loans.  Defendant Sieracki thus

knew, or was reckless in not knowing, that his representations concerning Countrywide's

financial condition, including its viability and liquidity, were false and misleading when made

because Countrywide's true financial condition was precarious and the Countrywide Defendants,

including Sieracki, had no reasonable basis for their assurances about Countrywide's financial

condition. (*See* ¶¶ 149-150, above.)

187.    As alleged herein, throughout the relevant period, Defendant Sieracki made a

number of materially false and misleading statements regarding Countrywide's true financial

condition, including its viability and liquidity, which Defendant Sieracki knew, or was reckless in not knowing, were materially false or misleading when made.

188.    In addition, Sieracki was motivated to misrepresent the public material facts about Countrywide's true financial condition in order to secure and maintain his extraordinary level of compensation. Sieracki received total compensation of $2.9 million in 2007, and $2.6 million in 2006, a substantial portion of which was based on Countrywide's reported financial performance.

189.    Alternatively, Sieracki made his materially false and misleading statements through negligence.

**Countrywide's Corporate Scienter**

190.    The cumulative knowledge of all Countrywide's agents, including Defendants Mozilo, Sambol and Sieracki, is imputed to it.

191.    Countrywide and its agents knew, or were reckless in not knowing, Countrywide's true financial condition, including its viability and liquidity.

192.    The facts alleged herein concerning, among other things, the scienter of Defendants Mozilo, Sambol and Sieracki, create a strong inference that, within the scope of their employment, one or more officers or agents of Countrywide acted knowingly or recklessly in violating the securities laws.

193.    Apart from the Individual Countrywide Defendants, neither Countrywide nor any of its other agents corrected or updated the materially false and misleading information Countrywide and its agents had disseminated to the market, despite Countrywide's and its agents' knowledge of Countrywide's true financial condition.

**Bank of America Defendants' Scienter**

194.    As alleged herein, each of the Bank of America Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in Bank of America's name regarding Countrywide's business and performance were materially false and misleading when made, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities law and common law of the State of New York.

**Kenneth D. Lewis**

195.    On or about August 23, 2007, Bank of America invested $2 billion in Countrywide.

196.    In connection with Bank of America's August 2007 investment in Countrywide, Bank of America performed due diligence.

197.    In connection with and in advance of its agreement to merge with Countrywide, Bank of America represented that it performed twice as much due diligence as usual "with twice as many people," which Defendant Lewis characterized as "deep due diligence."

198.    This due diligence revealed Countrywide's true financial condition, including that liquidity had disappeared and Countrywide had ceased to be a viable company in 2007.

199.    As Chairman, Chief Executive Officer and President of Bank of America, Lewis, at the time that he made his January 14, 2008 and April 23, 2008 statements, had access to and knew, or was reckless in not knowing, the results of Bank of America's due diligence performed in connection with its August 2007 investment in Countrywide and its subsequent acquisition of

Countrywide. Thus, at the time of his January 14, 2008 and April 23, 2008 statements, Lewis knew, or was reckless in not knowing, Countrywide's true financial condition, including that liquidity had disappeared and that Countrywide had ceased to be a viable company months before.

200.    Indeed, Lewis, through his descriptions of Bank of America's "deep due diligence," held himself out as knowledgeable about Countrywide's financial condition and held out that knowledge as the basis for his January 14, 2008 and April 23, 2008 statements about Countrywide.

201.    Thus, Defendant Lewis knew, or was reckless in not knowing, that his public statements on January 14, 2008, dismissing fears of Countrywide's bankruptcy as just "a malicious rumor" and telling investors on Bank of America's behalf that Countrywide "had a very impressive liquidity plan; they had their backup lines in place" were materially false and misleading when made.

202.    Similarly, Defendant Lewis knew, or was reckless in not knowing, that his public statement on April 23, 2008, that "the deep due diligence we performed confirmed our belief that there is great long-term value embedded in Countrywide's business," was materially false and misleading when made.

203.    Defendant Lewis was motivated to misrepresent and conceal the truth about Countrywide's liquidity, financial condition and viability because, among other things, Lewis was implementing a sustained and extensive plan to grow Bank of America by a series of acquisitions paid for with Bank of America stock, a plan which would have been at risk had the truth about Bank of America's investment in Countrywide been revealed. Between the time

Defendant Lewis took over Bank of America in April 2001 and the acquisition of Countrywide in 2008, Bank of America went on a massive acquisition spree, acquiring, among others:

- FleetBoston Financial Corp., the seventh-largest U.S. bank, for about $47 billion in cash and stock;

- MBNA Corp., the largest independent U.S. credit card issuer, for about $35 billion in cash and stock;

- U.S. Trust Corp., the private banking unit of Charles Schwab Corp., for $3.3 billion;

- a 24.9% stake in SLM Corp., the student lender known as "Sallie Mae," for $2.2 billion; and

- Chicago's LaSalle Bank, for $21 billion.

Following the acquisition of Countrywide for stock, Bank of America under Lewis went on to acquire Merrill Lynch & Co. for approximately $50 billion in an all-stock transaction.

204.    Indeed, Defendant Lewis acknowledged this plan of growth-by-acquisition in his April 23, 2008 speech at the annual meeting of Bank of America shareholders, describing his "bold steps to grow Bank of America through targeted acquisitions":

> We have methodically built leading positions in the most important wealth and growth markets, cornerstone products and key distribution areas to drive the company's future growth. These include our acquisitions of FleetBoston, MBNA, U.S. Trust, LaSalle and, later this year, Countrywide. Our acquisition of Countrywide will make Bank of America the nation's leading home loan provider and servicer.

205.    Had Lewis revealed the truth about Countrywide's financial condition, Countrywide would likely have collapsed and Lewis's plan to grow Bank of America through a series of acquisitions would have been jeopardized. Lewis was motivated to misrepresent and conceal the truth about Countrywide's financial condition, including its viability and liquidity, by the desire to complete this acquisition and to continue with Bank of America's plan of growth-by-acquisition.

206.    This is not the only time Lewis has concealed the poor financial condition of a target of acquisition in order to complete an acquisition. Lewis has admitted that he withheld information about losses at Merrill Lynch & Co. in order to complete Bank of America's $50 billion acquisition of that company, behavior that, once disclosed, led to Lewis's removal as chairman of Bank of America.

207.    Lewis had a further, personal motivation to misrepresent and conceal the truth about Countrywide. As *The Wall Street Journal* reported on August 27, 2007, Lewis was "known among bankers for craving respect" and "driven by …a belief that bankers from more elite backgrounds viewed him, and the North Carolina bank, with condescension." With Bank of America's $2 billion investment in Countywide, the *Journal* reported, Lewis had "finally penetrated a realm that had been denied to him and to his Charlotte, N.C., bank, despite its size. With the high-profile deal, the 60-year-old CEO has emerged as an undisputed peer to the leaders atop the New York banking dynasties…" For Lewis, this was more than just a business deal, but an important personal achievement satisfying his craving for respect.

208.    Lewis thus had an intense, concrete and personal motivation to misrepresent and conceal Countrywide's true financial condition, including in his statements on January 14, 2008 and April 23, 2008. If Lewis had revealed the truth regarding Countrywide, he would have admitted that the deal that finally allowed him to "penetrate[] a realm that had been denied him…as an undisputed peer to the leaders" of New York banking was a bad deal for Bank of America, which had invested $2 billion in, and agreed to acquire, a company that had already ceased to be viable. Such an admission was intolerable for Lewis.

209.    Defendant Lewis was also motivated to misrepresent and conceal Countrywide's true financial condition in order to protect Bank of America's $2 billion August 2007 investment

in Countrywide, which would have been jeopardized had Countrywide collapsed on the public disclosure of Countrywide's true financial condition.

210.    Defendant Lewis was also motivated to conceal the fact that Bank of America had invested $2 billion in a company that was not viable and with which Bank of America had agreed to merge.  If the truth about Bank of America's $2 billion investment in a non-viable company had been disclosed, the price of Bank of America stock would have suffered accordingly, thereby diminishing the value of Lewis's personal holdings of Bank of America stock, diminishing Bank of America's ability to make future acquisitions by using stock and threatening Lewis's ability to continue as Chairman, Chief Executive Officer and President of Bank of America.

211.    Lewis had the opportunity to commit and to participate in the wrongful conduct complained of herein.  As Chairman, Chief Executive Officer and President of Bank of America, Lewis controlled the information Bank of America disseminated to the investing public in Bank of America's press releases, SEC filings and communications with analysts and investors.  As a result, Lewis could falsify the information uncovered by Bank of America's due diligence regarding Countrywide that reached the public about Countrywide's business and performance.

**Bank of America's Corporate Scienter**

212.    The cumulative knowledge of all Bank of America's agents, including Defendant Lewis, is imputed to it.

213.    In connection with Bank of America's agreement to merge with Countrywide, Bank of America's agents performed "deep due diligence," involving twice as much due diligence as usual "with twice as many people."

214.    Thus, by the time Bank of America agreed, on January 11, 2008, to acquire Countrywide, Bank of America and its agents knew, or were reckless in not knowing, Countrywide's true financial condition, including its viability and liquidity.

215.    The knowledge of Bank of America employees who performed due diligence on Countrywide and the Bank of America executives who received reports of such due diligence, as well as the facts alleged herein concerning, among other things, Lewis's scienter, create a strong inference that, within the scope of their employment, one or more officers or agents of Bank of America acted knowingly or recklessly in violating the securities laws. Further, neither Bank of America nor its agents corrected or updated the materially false and misleading representations Lewis, on behalf of Bank of America, had disseminated to the market, despite Bank of America's and its agents' knowledge of Countrywide's true financial condition.

## LOSS CAUSATION

216.    The material misrepresentations and omissions detailed above (at, for example, ¶¶ 31-32, 34-35, 38-39, 43, 49, 53, 56-57, 62, 72, 74-75, 79, 82-83, 87-88, 95, 98, 112-114, 118, 121, above) fraudulently misrepresented Countrywide's deterioration and vulnerability to changing market circumstances as a result of Countrywide's poor financial condition, including inadequate liquidity and its ceasing to be a viable company, thereby creating and maintaining artificially inflated prices for Countrywide common stock and other securities.

217.    Those misrepresentations and omissions that were not immediately followed by an upward movement in the prices of Countrywide common stock and other securities served to maintain Countrywide common stock and other securities at artificially inflated levels by maintaining and supporting the false positive perception of Countrywide's financial condition, including its viability and liquidity.

218.    The Countrywide Defendants had a duty promptly to disseminate accurate and truthful information with respect to Countrywide's liquidity, financial condition and viability, and Defendants had a duty promptly to correct or update any information they previously disseminated that was materially false or misleading to the market. As a result of Defendants' failures to do so, the prices of Countrywide common stock and other securities were artificially inflated, directly causing Plaintiff to suffer damages when Countrywide common stock and other securities declined in value due to partial disclosures on dates including July 24, 2007, August 9, 2007, August 13, 2007, August 15, 2007, August 16, 2007, August 24, 2007, August 27, 2007, September 10, 2007, October 11, 2007, October 24, 2007, October 30, 2007, November 7, 2007, November 13, 2007, November 26, 2007, December 13, 2007, January 9, 2008, January 11, 2008, February 29, 2008 and March 8, 2008, as set forth below.

219.    Defendants' materially false and misleading statements in their press releases, SEC filings and other public statements were the proximate cause of losses suffered by Plaintiff.

*July 24, 2007 Partial Corrective Disclosure*

220.    On July 24, 2007, Countrywide issued a press release and filed a Form 8-K with the SEC announcing Countrywide's financial results for the second quarter of 2007. Countrywide's quarterly release partially corrected Defendants' earlier false and misleading statements and caused a sharp decline in Countrywide's stock price. However, the Countrywide Defendants dampened the effect of the July 24, 2007 partial corrective disclosures by making additional fraudulent statements that day in an effort to bolster Countrywide's stock price and blunt the impact of the corrective disclosures on the market, as set forth above. (*See* ¶ 43, above.)

221.     Countrywide's July 24, 2007 press release and 8-K disclosed that, in the second quarter, the delinquency rate for subprime loans Countrywide served had risen over 150%, from 9.45% as of March 31, 2007 to 23.71%.  Further, Countrywide disclosed that, over that same period, the delinquency rates for the prime home equity loans it served had also more than doubled to 4.56% from 2.15%.

222.     Countrywide's July 24, 2007 disclosure of its unexpectedly high rates of delinquencies, which revealed that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than anticipated, was a partial corrective disclosure with respect to the Countrywide Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity.

223.     As a consequence of Countrywide's July 24, 2007 partial corrective disclosure, Countrywide's stock dropped more than 10.5%, falling from its July 23, 2007 close at $34.06 to close at $30.50 on July 24, 2007, on volume of over 51 million shares, four times the volume of the prior trading day.  By August 3, 2007, when Countrywide stock closed at $25.00, it had lost 26.6% of its value from its July 23, 2007 close.

224.     This loss, which was caused by the July 24, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

***August 9, 2007 Partial Corrective Disclosure***

225.     On August 9, 2007, Countrywide filed with the SEC its Form 10-Q for the second quarter 2007, which disclosed that "during the third quarter, funding liquidity to mortgage companies became constrained" and "the secondary market and funding liquidity situation is rapidly evolving and the potential impact on the Company is unknown."

226.    Countrywide's August 9, 2007 10-Q partially corrected the Countrywide Defendants' earlier false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity, and caused a decline in Countrywide's stock price. However, the Countrywide Defendants dampened the effect of these disclosures by making simultaneous fraudulent misrepresentations in that same August 9, 2007 10-Q in an effort to bolster the Company's stock price and blunt the impact of the partial corrective disclosure on the market.  For example, the August 9, 2007 10-Q contained the materially false and misleading representation that Countrywide had "adequate funding liquidity to accommodate these marketplace changes in the near term…" (*See* ¶¶ 56-57, above.)

227.    As a consequence of Countrywide's August 9, 2007 partial corrective disclosure, Countrywide's stock dropped 4.3% over two days, falling from its August 8, 2007 close at $29.11 to close at $27.86 on August 10, 2007.

228.    This loss, which was caused by the August 9, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*August 13, 2007 Partial Corrective Disclosure*

229.    As set forth above, on August 13, 2007, Merrill Lynch & Co. issued an analyst report identifying the danger inadequate liquidity posed to Countrywide (emphasis added):

> CFC currently has about $185B in available credit facilities, though the concern is that these facilities could be terminated or the terms changed meaningfully, thus impacting CFC's ability to operate normally.  **We cannot understate the importance of liquidity for a specialty finance company like CFC.**  If enough financial pressure is placed on CFC or if the market loses confidence in its ability to function properly then the model can break, leading to an effective insolvency. If liquidations occur in a weak market, **then it is possible for CFC to go bankrupt.**

(*See* ¶ 60, above.)

230. The August 13, 2007 Merrill Lynch & Co. analyst report was a partial corrective disclosure with regard to prior materially false and misleading statements by the Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

231. As a consequence of the August 13, 2007 analyst report, Countrywide's stock, which had closed on the prior trading day at $27.86, dropped more than 12% to close at $24.46 on August 14, 2007.

232. This loss, which was caused by the August 13, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

### August 15, 2007 Partial Corrective Disclosure

233. On August 15, 2007, Merrill Lynch & Co. issued an analyst report following up on its August 13, 2007 report. The August 15 report, entitled "Liquidity is the Achilles Heel," downgraded Countrywide from "buy" to "sell" based on perceived liquidity problems at Countrywide. The analyst suggested that Countrywide might face bankruptcy.

234. The August 15, 2007 Merrill Lynch analyst report was a partial corrective disclosure with regard to prior materially false and misleading statements by Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

235. As a consequence of the August 15, 2007 analyst report, Countrywide's stock, which had closed on the prior trading day at $24.46, dropped approximately 13% to close at $21.29 on volume of over 118 million shares, more than three times the volume of the prior trading day.

236.    This loss, which was caused by the August 15, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*August 16, 2007 Partial Corrective Disclosure*

237.    On August 16, 2007, Countrywide announced that it drew its entire $11.5 billion credit facility in order to "supplement[] its liquidity funding position."

238.    In response, Standard & Poor's, Moody's Investors Service and Fitch Ratings downgraded Countrywide securities.  Explaining its downgrades, Fitch Ratings cited Countrywide's "reduced liquidity" and "deteriorating asset quality."

239.    The decision to access its $11.5 billion credit facility and the rating agency downgrades were both partial corrective disclosures with regard to prior materially false and misleading statements by Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

240.    As a consequence of the announcement of Countrywide's drawing its $11.5 billion credit facility and rating agency downgrades, Countrywide's stock price declined by approximately 11% from its previous close of $21.29 to close at $18.95 on August 16, 2007 on volume of over 200 million shares, nearly double the trading on August 15, 2007 and nearly six times the trading volume on August 14, 2007.

241.    This loss, which was caused by the August 16, 2007 partial corrective disclosures, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*August 24, 2007 Partial Corrective Disclosure*

242.    On August 24, 2007, Fitch Ratings downgraded Countrywide Home Loans, Inc.'s servicer rating with respect to a series of loan categories and placed the ratings on "Rating Watch Evolving" status – a signal that there could be further downgrades. In its press release announcing the downgrades, Fitch cited "the continued pressure on CHL's [Countrywide Home Loans'] liquidity position and financial flexibility."

243.    The August 24, 2007 downgrade was a partial corrective disclosure with regard to prior materially false and misleading statements by Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

244.    As a consequence of the August 24, 2007 downgrade, Countrywide's stock, which had closed on the prior trading day at $22.02 lost approximately 4.6% to close at $21.00 on volume of over 66 million shares.

245.    This loss, which was caused by the August 24, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*August 27, 2007 Partial Corrective Disclosure*

246.    On August 27, 2007, Lehman Brothers issued a report that lowered earnings projections for Countrywide on the ground that Countrywide would have to mark down the value of loans that Countrywide reflected on its balance sheet.

247.    The August 27, 2007 lowered earnings projections revealed to the market that Countrywide's mortgage and mortgage-related assets were worth less than Countrywide had stated, and thus was a partial corrective disclosure with regard to prior materially false and

misleading statements by Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

248.   As a consequence of the August 27, 2007 lowered earnings projections, Countrywide's stock, which had closed on the prior trading day at $21.00 fell to close at $19.31 on August 28, 2007, a loss of over 8%.

249.   This loss, which was caused by the August 27, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

***September 10, 2007 Partial Corrective Disclosure***

250.   Late on Friday, September 7, 2007, Countrywide announced a plan to lay off between "10,000 to 12,000 [employees] over the next three months representing up to 20 percent of its current workforce."

251.   This announcement revealed that Countrywide was being forced to take drastic measures to cut expenses, signaling that Countrywide's financial condition, including its viability and liquidity were less sound than Countrywide had stated, and was thus a partial corrective disclosure with regard to prior materially false and misleading statements by Countrywide Defendants concerning Countrywide's financial condition and viability.

252.   On this news, Countrywide's stock fell from its prior close of $18.21 to close at $17.21 on September 10, 2007, a loss of 5.5%, and $16.62 on September 12, 2007, a loss of 8.7%.

253.   This loss, which was caused by the September 10, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*October 11, 2007 Partial Corrective Disclosure*

254.    On October 11, 2007, Countrywide issued a press release and filed a Form 8-K releasing its September 2007 operational data in which it disclosed further deterioration in its delinquency and foreclosure rates.  Countrywide disclosed that delinquencies as a percentage of unpaid principal balances had risen nearly 45% to reach 5.85% from 4.04% a year earlier. Countrywide further disclosed that foreclosures in its mortgage portfolio had risen 150%, to 1.27% from 0.51% a year earlier.

255.    Countrywide's October 11, 2007 disclosure of its unexpectedly high rates of delinquencies and pending foreclosures, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than anticipated, was a partial corrective disclosure with respect to the Countrywide Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity.

256.    On the news, Countrywide's stock dropped nearly 20%, falling from its October 10, 2007 close at $18.80 to close at $15.05 on October 23, 2007.

257.    This loss, which was caused by the October 11, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*October 24, 2007 Partial Corrective Disclosure*

258.    On October 24, 2007, *The Wall Street Journal* reported that "[s]ubprime mortgages aren't the only challenge facing Countrywide Financial Corp., the nation's biggest home-mortgage lender.  Some loans classified as prime when they were originated are now going bad at a rapid rate."  The *Journal* article revealed that Countrywide held $27.8 billion of

pay-option adjustable rate mortgages, representing about 41% of the loans held as investments by Countrywide, and that the percentage of such loans which were at least 30 days past due had more than tripled from a year earlier, from 1.6% to 5.7%.

259.    The October 24, 2007 article, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than anticipated, was a partial corrective disclosure with respect to the Countrywide Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity.

260.    As a consequence of the October 24, 2007 partial corrective disclosure, Countrywide's stock fell from its prior close of $15.05 to close at $13.83 on October 24, 2007, a loss of 8.1% on volume of over 66 million shares, and to close at 13.07 on October 25, 2007, a loss of over 13%.

261.    This loss, which was caused by the October 24, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*October 30, 2007 Partial Corrective Disclosure*

262.    On October 30, 2007, *The Wall Street Journal* reported that "some analysts warn that [Countrywide]...hasn't gone far enough in marking down the value of mortgage securities it holds." The *Journal* reported that analysts were "question[ing] whether Countrywide has gone far enough in marking down assets" and cited two analysts as questioning whether Countrywide had adequately "provid[ed] for future loan losses."

263.    The October 30, 2007 article, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and that Countrywide was likely

to have more substantial losses than anticipated or provided for, was thus a partial corrective disclosure with regard to prior materially false and misleading statements by Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

264.    The *Journal* also asserted that Countrywide "may have trouble delivering on" what the *Journal* called its "profit vow" on October 26, 2007 – Defendant Mozilo's statement that Countrywide "anticipate[d] that the Company will be profitable in the fourth quarter and in 2008," set forth above (*see* ¶ 72, 74, above) – thereby partially correcting Countrywide's and Mozilo's false and misleading representations concerning Countrywide's financial condition.

265.    As a consequence of the October 30, 2007 article, Countrywide's stock fell 5.2% from the prior close of $16.83 to close at $15.94 on October 30, 2007 and fell for the rest of the trading week, losing 15% of its value to close at $14.35 on November 2, 2007.

266.    This loss, which was caused by the October 30, 2007 partial corrective disclosures, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

**November 7, 2007 Partial Corrective Disclosure**

267.    On November 7, 2007, Gradient Analytics, Inc. ("Gradient"), an independent equity research firm, issued a report detailing techniques "for misstating the earnings and net assets at firms that are heavily invested in mortgages and related securities." The Gradient report analyzed five major U.S. mortgage businesses, including Countrywide. The report concluded, *inter alia*, that Countrywide "appears to be at risk from virtually all the mortgage accounting games highlighted in this report." Specifically, the report highlighted the following risks:

- The value of Countrywide's retained interests was subject to "further write-downs. Accordingly, we expect to see more losses reported down the road";

- The value of Countrywide's mortgage servicing rights was "materially overstated";

- The value of Countrywide's loans held for investment was misstated;

- Countrywide's interest income from negative amortization loans, accounting for more than 30% of Countrywide consolidated income for the first six months of 2007, was "unsustainable and, therefore, of lower quality"; and

- Countrywide's reclassification of a large chunk of loans from trading securities to the held-for-investment category "reflect[ed] efforts to engage in loss avoidance."

268.   The November 7, 2007 report revealed that Countrywide's mortgage and mortgage-related assets were worth less than Countrywide had reported, that Countrywide's income was likely to decrease, and that Countrywide's financial reporting was likely concealing substantial losses.  The report was thus a partial correction of prior false and misleading statements by the Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

269.   As a consequence of the issuance of this report, Countrywide's stock declined approximately 10.3% from its close the prior day at $15.02 to close at $13.47 on November 8, 2007.

270.   This loss, which was caused by the November 7, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*November 13, 2007 Partial Corrective Disclosure*

271.   Late on November 13, 2007, Countrywide issued a press release and filed a Form 8-K releasing its October 2007 operational data, in which it disclosed further deterioration in its delinquency and foreclosure rates.  Countrywide disclosed that pending foreclosures on its

mortgage loans as a percentage of unpaid principle balance had more than doubled, from 0.58% to 1.23%, and that delinquencies on its mortgage loans as a percentage of unpaid principle balance had risen 50%, from 3.97% to 5.94%, from a year earlier.

272.    Countrywide's November 13, 2007 disclosure of its unexpectedly high rates of delinquencies and pending foreclosures, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than anticipated, was a partial corrective disclosure with respect to the Countrywide Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity.

273.    On the news, Countrywide's stock dropped 31.3% over the next week, from its November 13, 2007 close at $13.72 to close at $9.42 on November 21, 2007.

274.    This loss, which was caused by the November 13, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

### *November 26, 2007 Partial Corrective Disclosure*

275.    On November 26, 2007, *The Wall Street Journal* reported on the crucial role that the Federal Home Loan Bank of Atlanta ("FHLB") had been playing a source of liquidity for Countrywide that "ha[d] helped to keep Countrywide in business since mid-August" and reported that Countrywide's ability to rely on liquidity from the FHLB was close to ending because Countrywide was approaching the ceiling that the FHLB put on advances. The *Journal* reported that Countrywide's "borrowings [from the FHLB] totaled $51.1 billion as of Sept. 30, up 77% from three months earlier." The *Journal* noted that the FHLB "limit[s] any member's total advances to 50% of that member's assets" and warned that "Countrywide's savings bank

had assets of $106 billion at the end of October, which suggests that its advances are near that ceiling."

276.    The November 26 article about Countrywide's dependence on the FHLB as a source of liquidity and the exhaustion of Countrywide's ability to rely on it for liquidity was a partial correction of a number of prior false and misleading statements by the Countrywide Defendants concerning Countrywide's financial condition, including its viability and liquidity.

277.    On the news, Countrywide's share price dropped from $9.65 to close at $8.64 on November 26, 2007, a loss of more than 10% on trading of nearly 55 million shares, more than two and a half times the volume of the previous trading day.

278.    This loss, which was caused by the November 26, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

### December 13, 2007 Partial Corrective Disclosure

279.    On December 13, 2007, Countrywide issued a press release and filed a Form 8-K with the SEC releasing its November 2007 operational data in which it disclosed further deterioration in its delinquency and foreclosure rates. For example, Countrywide disclosed that, as of November 30, 2007, its rate of delinquency as a percentage of loans served had increased to 6.34%, an increase of more than 38% over the previous year and that its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled from the previous year, to 1.28%.

280.    Countrywide's December 13, 2007 disclosure of its unexpectedly high rates of delinquencies and pending foreclosures, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than

anticipated, was a partial corrective disclosure with respect to the Countrywide Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity.

281.    On the news, Countrywide's stock dropped more than 16%, falling steadily over the following week from its December 12, 2007 close at $10.53 to close at $8.77 on December 20, 2007.

282.    This loss, which was caused by the December 13, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*January 9, 2008 Partial Corrective Disclosure*

283.    On January 9, 2008, Countrywide issued a press release and filed a Form 8-K with the SEC releasing its operational data for December 2007 in which it disclosed that by December 31, 2007, its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.44%, compared to 0.70% as of December 31, 2006.  Countrywide also disclosed that by December 31, 2007, its rate of delinquency as a percentage of unpaid principal balance had increased by more than 55% to 7.2%, compared to 4.6% as of December 31, 2006.

284.    As a Reuters article published after the market closed on January 9, 2008 explained, the rates of foreclosures and delinquencies that Countrywide disclosed in its December monthly operating report were "the highest on record, sending its shares tumbling…to their lowest in nearly 13 years." As Reuters noted, "[a]nalysts attributed Wednesday's drop to deteriorating credit quality reflected in Countrywide's monthly operating report, and renewed

concern that the lender might not survive the housing crunch and could seek bankruptcy protection."

285.    Countrywide's January 9, 2008 disclosure of its unexpectedly high rates of foreclosures and delinquencies, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than anticipated, was a partial corrective disclosure with respect to the Countrywide Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity.

286.    On the news, Countrywide's stock dropped 6.4% from its close on January 8, 2008 of $5.47 to close on January 9 at $5.12 on heavy volume of over 164 million shares.

287.    This loss, which was caused by the January 9, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*January 11, 2008 Partial Corrective Disclosure*

288.    On the afternoon of January 10, 2008, it was reported that Bank of America was in advanced talks to acquire Countrywide.  Countrywide stock rose on that news to close at $7.75.

289.    Prior to the market's opening on Friday, January 11, 2008, Bank of America "announced a definitive arrangement to purchase Countrywide Financial Corp. in an all-stock transaction worth approximately $4 billion."

290.    The approximately $4 billion that Bank of America announced that it was paying for Countrywide represented less than 30% of Countrywide's most recently reported book value.

291.    Bank of America's announcement of the agreement to purchase Countrywide for less than 30% of Countrywide's book value signaled that Bank of America's due diligence had uncovered that Countrywide's true value was far less than its reported value and was thus a partial corrective disclosure with respect to the Countrywide Defendants' false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity.

292.    On this news, Countrywide's stock price fell on January 11, 2008 by approximately 18.3%, from $7.75 to $6.33, on volume of over 234 million shares and fell steadily over the next week to close at $4.96 on January 18, 2009, an overall drop of 36% from the January 10, 2008 close.

293.    This loss, which was caused by the January 11, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

***February 29, 2008 Partial Corrective Disclosure***

294.    On late Friday, February 29, 2008 Countrywide filed its Form 10-K for 2007 with the SEC, which revealed that Countrywide suffered a loss of $1.6 billion in the second half of 2007.

295.    In its 2007 10-K, Countrywide further disclosed that Countrywide held $28.42 billion of pay-option adjustable rate mortgages, and that the percentage of such loans which were at least 90 days past due had risen 800% from a year earlier, from 0.6% to 5.4%. Countrywide further disclosed that 71% of its pay-option adjustable rate mortgage borrowers were making only minimal payments which covering only part of the interest normally due, causing their loan balance to grow. Countrywide also disclosed that half of the $87.04 billion of mortgage loans

held by its bank were backed by homes in California and Florida, two of the states hit hardest by falling home prices.

296.    As *The Wall Street Journal* reported before the market opened on Monday, March 3, 2008, that in Countrywide's 2007 10-K, Countrywide

> also provided more details on a setback that prevented it from fulfilling its October forecast that it would be profitable in the fourth quarter.
>
> Countrywide was blindsided during the quarter by obligations on home-equity lines of credit that it had sold to investors in the form of securities. Normally, the trusts that control such securities reimburse the lender when borrowers make further draws on these lines of credit. But if losses on the loans exceed certain levels, Countrywide isn't reimbursed immediately and may never be reimbursed unless income from the loans outstanding is sufficient to meet obligations to investors in the securities.
>
> Countrywide said the likelihood of such a situation was "deemed remote" until late 2007. It blamed a "sudden deterioration" in the housing market. As a result, it recorded a $704 million loss to cover the estimated costs of its obligations on the lines of credit.
>
> Further losses may lie ahead. Borrowers can pay down these lines of credit and then draw new funds later, Countrywide said. As a result, it said, the company's "maximum obligation cannot be defined."
>
> Countrywide officials have said they didn't expect these losses in late October, when Chief Executive Angelo Mozilo forecast a profit for the fourth quarter. The company ended up reporting a loss of $422 million for that quarter.
>
> A Countrywide computer model used to gauge risks on these securities didn't take into account the possible effects of exceeding the loss levels that cut off reimbursements, according to a Dec. 28, 2006 internal report reviewed by *The Wall Street Journal.*

297.    Countrywide's February 29, 2008 disclosures of its unexpectedly high rates of foreclosures and delinquencies, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than anticipated, its 2007 losses and its inability to define a maximum for its future obligations, were partial

corrective disclosures with regard to prior materially false and misleading statements by Defendants concerning Countrywide's financial condition, including its viability and liquidity, including those statements made by Lewis on January 14, 2008.

298.    On this news, Countrywide's stock price fell over the next week from its close on February 29, 2008 of $6.31 to close on March 7, 2008 at $5.07, a loss of nearly 20%.

299.    This loss, which was caused by the February 29 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

***March 8, 2008 Partial Corrective Disclosure***

300.    On March 8, 2008, *The Wall Street Journal* reported that "[t]he Federal Bureau of Investigation is probing...Countrywide Financial Corp. for possible securities fraud" involving "whether company officials made misrepresentations about the Company's financial position" and whether Countrywide "had been candid in accounting for losses," noting that "[p]eople familiar with the matter said that Countrywide's losses may be several times greater than it has disclosed."

301.    This story was a partial corrective disclosure with regard to a series of prior materially false and misleading statements by Defendants concerning Countrywide's financial condition, including its viability and liquidity, including those statements made by Lewis on January 14, 2008.

302.    On this news, Countrywide stock, which had closed at $5.07 on March 7, lost approximately 14% of its value on the next trading day to close at $4.36 on volume of over 35 million shares.  It was Countrywide's lowest closing price since April 5, 1995.

303.    This loss, which was caused by the March 8, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

***April 29, 2008 and May 2, 2008 Partial Corrective Disclosures***

304.    On April 29, 2008, Countrywide issued a press release and filed a Form 8-K with the SEC releasing the results of its operations and financial condition for the first quarter of 2008, in which it disclosed a net loss of $893 million, which included a $1.5 billion provision for loan losses.  Countrywide also disclosed that its 90-day delinquency as a percentage of outstanding loan balances in its servicing portfolio had nearly tripled from a year earlier, from 1.7% to 4.81%.

305.    Countrywide's April 29, 2008 disclosure of its unexpectedly high rates of delinquencies, which revealed to the market that Countrywide's mortgage and mortgage-related assets were declining in value and generating less liquidity than anticipated, was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity, including those made by Defendant Lewis on January 14, 2008 and April 23, 2008.

306.    In response to Countrywide's disclosure, Standard and Poor's cut Countrywide's debt ratings to "junk" on May 2, 2008, which also served as a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Countrywide's financial condition, including its viability and liquidity, including those made by Defendant Lewis on January 14, 2008 and April 23, 2008.

307. As a result of Countrywide's April 29, 2008 disclosure and the resultant downgrade of Countrywide's debt, Countrywide stock lost 18.6%, dropping from its April 29, 2008 close of $5.85 to close at $4.76 on May 9, 2008.

308. This loss, which was caused by the April 29, 2008 and May 2, 2008 partial corrective disclosures, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

## ALTERNATIVE PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET

309. As a result of the actions alleged above, the market price of Countrywide's common stock and other securities was artificially inflated.

(a) At all relevant times, the market for Countrywide's common stock and other securities was an efficient market for the following reasons, among others: Countrywide securities met the requirements for listing and were listed and actively traded on the New York Stock Exchange, a highly efficient market;

(b) as a regulated issuer, Countrywide filed periodic public reports with the SEC;

(c) Countrywide regularly communicated with public investors through established market communication mechanisms, including regular dissemination of press releases on major newswire services and other wide-ranging public disclosures, such as communications with the financial press;

(d) the market reacted to the public information disseminated by Countrywide;

(e) securities analysts employed by brokerage firms followed Countrywide and wrote publicly available reports about the company that were distributed to the sales force

70

and to customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public market place;

       (f)    the material representations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Countrywide securities; and

       (g)    without knowledge of the misrepresented or omitted material facts, Plaintiff purchased or otherwise acquired Countrywide securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of Countrywide securities was inflated by Defendants' misrepresentations and omissions.

    310.    As a result, the market for Countrywide securities efficiently digested current information regarding the company from all publicly available sources and reflected such information in the price of Countrywide's securities.  In ignorance of the false and misleading representations and omissions by Defendants described above, Plaintiff relied, to its damage, on the integrity of the market as to the value of Countrywide's securities and acquired them at an artificially inflated price.  At the time of the acquisition of Countrywide stock and other securities by Plaintiff, the true fair market value of the securities was substantially less than the purported fair market value due to Defendants' material misrepresentations and omissions.

## NO SAFE HARBOR

    311.    Defendants cannot escape liability for their misrepresentations and omissions by resort to statutory safe harbor provided for forward-looking statements.  The statements alleged to be false or misleading in this Complaint relate to facts and conditions existing at the time the statements were made.  Moreover, to the extent Defendants may now seek to characterize any of these statements as "forward looking", they were not identified as "forward-looking" statements

when they were made.  Nor were the statements accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for those statements because at the time each one was made, the particular speaker had actual knowledge that the particular statement was false, and/or the statement was authorized and/or approved by an executive officer of Countrywide or Bank of America who knew that the statement was false when made.

## CLAIMS FOR RELIEF

### Count I

**(Section 10(b) of the Securities Exchange Act of 1934
and SEC Rule 10b-5—Manipulative and Deceptive Devices)**

312.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

313.    Defendants disseminated or approved the untrue statements described above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

314.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes and artifices to defraud;

    (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with its purchases of Countrywide common stock and other securities.

315.    Plaintiff has suffered damages in that, in reliance upon the integrity of the market, it purchased Countrywide common stock and other securities at prices which had been artificially inflated as a result of Defendants' false and misleading statements, prices which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were gradually revealed, thereby damaging Plaintiff.  Plaintiff would not have purchased Countrywide common stock and other securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

316.    Plaintiff individually and actually relied on Defendants' misrepresentations and omissions alleged herein in purchasing Countrywide common stock and/or other securities at inflated prices and suffered damages thereby.

317.    The underlying problems at Countrywide concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Countrywide's stock price that caused Plaintiff harm when the truth about Countrywide's problems was gradually disclosed to the market.

## Count II

### (Section 18 of the Securities Exchange Act of 1934—Misleading Statements)

318.    Plaintiff repeats and realleges each and every preceding allegation as if fully set forth herein.  For purposes of this Count, Plaintiff asserts only negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

319.     The Countrywide Defendants made or caused to be made untrue statements described above in documents filed pursuant to the Securities Exchange Act of 1934 or regulations promulgated thereunder.

320.     For example, Countrywide Defendants made or caused to be made untrue statements in Countrywide's 2006 and 2007 Form 10-K filings as set forth in ¶¶ 112-117, above, and in Countrywide's Form 8-K filings on August 6, 2007 and October 26, 2007, as set forth in ¶¶ 53-55, 72-73, above.

321.     Plaintiff has suffered damages in that, in reliance upon the Countrywide Defendants' materially false and misleading statements in documents filed pursuant to the Securities Exchange Act of 1934 or regulations promulgated thereunder as set forth above, it purchased Countrywide common stock and other securities at prices which had been artificially inflated as a result of those false and misleading statements, prices which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were gradually revealed, thereby damaging Plaintiff.  Plaintiff would not have purchased Countrywide common stock and other securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

322.     The underlying problems at Countrywide concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Countrywide's stock price that caused Plaintiff harm when the truth about Countrywide's problems was gradually disclosed to the market.

## Count III

**(Section 20 of the Securities Exchange Act
of 1934—Control Persons)**

323.    Plaintiff repeats and realleges each and every preceding allegation as if fully set forth herein.

324.    The Individual Countrywide Defendants acted as controlling persons of Countrywide within the meaning of § 20(a) of the Exchange Act.  By reason of their positions with Countrywide, and their ownership of Countrywide stock, the Individual Countrywide Defendants had the power and authority to cause Countrywide to engage in the wrongful conduct complained of herein.  Countrywide controlled the Individual Countrywide Defendants and all of its employees.

325.    As set forth above, Countrywide and the Individual Countrywide Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Countrywide Defendants are also liable pursuant to § 20(a) of the Exchange Act.

326.    As a direct and proximate result of the Countrywide Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases and sales of Countrywide common stock and other securities in that it paid artificially inflated prices for Countrywide common stock and other securities, which it sold at a substantial loss, as a result of the Countrywide Defendants' false and misleading statements.

327.    Lewis acted as a controlling person of Bank of America within the meaning of § 20(a) of the Exchange Act.  By reason of his position with Bank of America, and his ownership of Bank of America stock, Lewis had the power and authority to cause Bank of America to

engage in the wrongful conduct complained of herein. Bank of America controlled Lewis and all of its employees.

328.    As set forth above, Bank of America and Lewis each violated § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Lewis is also liable pursuant to § 20(a) of the Exchange Act.

329.    As a direct and proximate result of the Bank of America Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases and sales of Countrywide common stock and other securities in that it paid artificially inflated prices for Countrywide common stock and other securities, which it sold at a substantial loss, as a result of the Bank of America Defendants' false and misleading statements.

330.    The underlying problems at Countrywide concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Countrywide's stock price that caused Plaintiff harm when the truth about Countrywide's problems was gradually disclosed to the market.

## Count IV

### (Common Law Fraud)

331.    Plaintiff repeats and realleges each and every preceding allegation as if fully set forth herein.

332.    The representations by Defendants alleged herein regarding Countrywide's viability, liquidity and capital reserves were false.

333.    Defendants' materially false and misleading representations include:

   a.    Countrywide's 2006 10-K's representation that Countrywide's Liquidity Management Plan would "ensure that [Countrywide] maintain[ed]

adequate, appropriate and cost-effective sources of liquidity under all market conditions";

    b.    Sambol's representation on or about April 26, 2007, that Countrywide had "far more significant amount of excess capital than what the rating agency models would suggest or even what regulatory capital requirements are";

    c.    Mozilo's representation on or about April 26, 2007 that Countrywide had "excess capital";

    d.    On May 9, 2007, Countrywide's Q1 2007 10-Q's representations that Countrywide did "not expect the reduction in liquidity for nonprime loans to have adverse effects on [its] ability to effectively meet [its] financing requirements" and that Countrywide "establish[es] reliable sources of liquidity sized to meet a range of potential future funding requirements....We believe we have adequate financing capacity to meet our currently foreseeable needs.";

    e.    Defendant Sambol's representation, on or about May 23, 2007, that "while the subprime correction did have a material impact on our first-quarter results, we've made all the necessary adjustments to provide for further profitability" and that Countrywide's "core fundamentals are strong";

    f.    Defendant Sieracki's representation, on or about May 23, 2007, touting Countrywide's "[s]trong asset liquidity and quality, funding liquidity and capital adequacy" and representing that Countrywide's "[c]ontingent liquidity planning provides highly reliable financing options if access to capital markets is impaired.";

    g.    Defendant Mozilo's representation, on or about June 13, 2007, that Countrywide's "integration of strong capital and risk-management activities" "keep our Company in excellent fiscal condition";

    h    The Countrywide Defendants' representations regarding Countrywide's financial condition during Countrywide's Q2 2007 earnings call on or about July 24, 2007;

    i.    Countrywide's and Defendant Sieracki's representations regarding Countrywide's financial condition in Countrywide's press release entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition," on or about August 2, 2007;

    j.    Countrywide's August 6, 2007 8-K's representation that Countrywide had net available liquidity of $186.5 billion;

k.  Countrywide's Q2 2007 10-Q's assurances that while "during the third quarter, funding liquidity to mortgage companies became constrained," Countrywide had "adequate funding liquidity to accommodate these marketplace changes in the near term" and that Countrywide had "maintained access to our traditional, highly reliable short-term liquidity sources.";

l.  Defendant Mozilo's representations during an interview on CNBC on or about August 23, 2007 that the recent Merrill Lynch & Co. analysis of Countrywide as "baseless" and "irresponsible" and denying that Countrywide faced bankruptcy and that "there is no more chance for bankruptcy today for Countrywide than there was six months ago, a year ago, two years ago, and when the stock was $45 a share.  We are a very solid company.";

m.  The Countrywide Defendants' representations regarding Countrywide's financial condition during Countrywide's Q3 2007 earnings call on or about October 26, 2007;

n.  Countrywide's Q3 2007 10-Q's representation that "The Bank has significant liquidity sources available to fund our mortgage banking operations" and "we believe we have adequate funding liquidity";

o.  Mozilo's representation during a CNBC interview, on or about December 3, 2007, that Countrywide had "adequate liquidity and capital" and was "a strong, viable financial company.";

p.  Bigelow's and Sieracki's confirmation directly to SRM personnel on or about December 28, 2007, of the Countrywide Defendants' previous public statements regarding Countrywide's financial condition, liquidity and capital reserves and that Countrywide had sufficient liquidity to last for twelve months;

q.  Defendant Lewis's representations on or about January 14, 2008, that Countrywide's bankruptcy was just "a malicious rumor" and that Countrywide "had a very impressive liquidity plan; they had their backup lines in place";

r.  Countrywide's 2007 10-K's representations that "We believe that we have adequate liquidity to meet our obligations, including—but not limited to—our commitments to lend, maturities of debt and obligations to fund rapid amortization events.";

s.  Countrywide's Q1 2008 10-Q's representation that "we believe we currently have adequate funding liquidity"; and

  t.  Defendant Lewis's representation on April 23, 2008, that "the deep due diligence we performed confirmed our belief that there is great long-term value embedded in Countrywide's business."

334. Defendants knew their misrepresentations and omissions as to Countrywide's viability, liquidity and capital reserves were false.

335. Alternatively, Defendants had no reasonable foundation for their representations regarding Countrywide's viability, liquidity and capital reserves and recklessly made the representations identified in this Complaint.

336. All of Defendants' misrepresentations and omissions concerned facts that were peculiarly within the knowledge of Defendants and which were not readily available to Plaintiff. As Defendants knew, as a result of Defendants' misrepresentations and omissions, Plaintiff was acting under mistaken beliefs about these material facts. Defendants breached their duty by failing to disclose the truth to Plaintiff.

337. Defendants sometimes deceived Plaintiff through partial or ambiguous statements that non-public information available to Defendants rendered materially misleading. Defendants breached their duty by failing to disclose that information to Plaintiff.

338. Defendants intended and reasonably expected that their misrepresentations and omissions would cause Plaintiff to retain or increase its Countrywide investment, desist from further inquiry and remain passive. As a result of the misrepresentations and omissions alleged in this Complaint, Plaintiff lost the opportunity to investigate Countrywide's problems and to evaluate the steps, if any, Defendants were taking to try to address them.

339. As a result of these misrepresentations and omissions, Defendants deceived Plaintiff regarding Countrywide's true financial condition and thereby intentionally transformed

Plaintiff's indecision about whether to sell or keep their Countrywide investment into a damaging decision to retain or increase it.

340.    Plaintiff increased its investment in Countrywide, including through purchases of Countrywide common stock and other securities, and retained its existing investment in Countrywide in justifiable reliance on Defendants' fraudulent misrepresentations and omissions.

341.    The underlying problems at Countrywide concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Countrywide's stock price that caused Plaintiff harm when the truth about Countrywide's problems was gradually disclosed to the market.

342.    By virtue of the material misrepresentations and omissions alleged herein, Defendants are liable to Plaintiff for damages for actual and/or constructive fraud under the common law of the State of New York in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(a)    award Plaintiff damages for all injuries suffered as a result of Defendants' wrongdoing;

(b)    award Plaintiff prejudgment interest at the maximum rate allowable by law;

(c)    award Plaintiff its reasonable attorney fees, expenses and costs of this litigation; and

(d)    award Plaintiff such other and further relief as it may show themselves justly entitled.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated:  May 29, 2009

BOIES SCHILLER & FLEXNER LLP

By: _____

Philip Korologos
575 Lexington Avenue
7th Floor
New York, NY 10022
Phone: (212) 446-2300
Fax: (212) 446-2350

Richard B. Drubel
Matthew J. Henken
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
Phone:  (603) 643-9090
Fax:  (603) 643-9010

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Direct: (312) 641-9760
Fax: (312) 641-9751

Stephen M. Tillery
Douglas R. Sprong
Christopher A. Hoffman
KOREIN TILLERY LLC
505 North 7th Street,
Suite 3600
St. Louis, MO 63101
Phone:  (314) 241-4844
Fax:  (314) 241-3525

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                    :

SRM GLOBAL FUND LIMITED PARTNERSHIP, :     09-cv-5064 (RMB)
                                    :
              Plaintiff,           :
                                    :
       -against-            :     **AFFIDAVIT**
                                    :     **OF SERVICE**

COUNTRYWIDE FINANCIAL CORPORATION  :
(n/k/a BANK OF AMERICA HOME LOANS),  :
ANGELO R. MOZILO, DAVID SAMBOL,    :
ERIC P. SIERACKI, BANK OF AMERICA    :
CORPORATION, and KENNETH D. LEWIS,  :
                                    :
             Defendants.      :
                                    :
------------------------------------------------------------X

State of New York    )
                  ) ss:.
County of New York )

        JOHN PASTERICK, being duly sworn, deposes and says:

        1. I am not a party to this action and I am over 21 years of age.

        2. I am employed by the law firm of Boies, Schiller & Flexner LLP, 575

Lexington Avenue, New York, New York 10022, attorneys for the Plaintiff.

        3. On June 18, 2009 I serve true copies of the Amended Complaint in this

proceeding by depositing said copies in postage-paid, sealed envelopes in a depository

under the exclusive care and custody of the United States Postal Service within the city

and State of New York addressed to the following:

Kenneth Heitz, Esq.                       Eric P. Sieracki
Irell & Manella LLP                     910 Lake Sherwood Drive
1800 Avenue of the Stars, Suite 900      Westlake Village, CA 91361
Los Angeles, CA 90067-4276          *Defendant*
*Attorneys for Defendant Angelo R. Mozilo*

Michael D. Torpey, Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
*Attorneys for Defendant David Sambol*

Lori Lynn Phillips, Esq.
Heller Ehrman LLP (Seattle)
701 Fifth Avenue, Suite 6100
Seattle, WA 98104
*Attorneys for Defendant David Sambol*

Kenneth D. Lewis
7517 Morrocroft Farms Lane
Charlotte, NC 28211
*Defendant*

Bank of America Corporation
100 North Tryon Street
Charlotte, NC 28255
*Defendant*

Bradley J. Butwin, Esq.
Jonathan Rosenberg, Esq.
William J. Sushon, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
*Attorneys for Defendant Bank of America Corporation in related proceeding pending in the State Of Delaware Chancery Court, entitled In re: Countrywide Corporation Shareholders Litigation; C.A. No. 3464-VCN*

4.  Furthermore, on June 18, 2009 I served a true copy of the Amended Complaint in this proceeding by personal delivery addressed to:

Meredith Kotler, Esq.
Mitchell A. Lowenthal, Esq.
Cleary Gottlieb Steen & Hamilton, LLP
1 Liberty Plaza
New York, New York 10006
*Attorneys for Defendant Countrywide Financial Corporation (n/k/a Bank of America Home Loans)*

_____
JOHN PASTERICK

Sworn to before me this
18th day of June, 2009

_____
Notary Public

SUSAN REDDINGTON
Notary Public, State of New York
No. 31-4829932
Qualified in New York County
Commission Expires May 31, 2011