UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/17/10

SRM GLOBAL FUND LIMITED
PARTNERSHIP,

                                        Plaintiff,

                    -against-

COUNTRYWIDE FINANCIAL
CORPORATION, ANGELO R. MOZILO,
DAVID SAMBOL, ERIC P. SIERACKI,
BANK OF AMERICA CORPORATION,
and KENNETH D. LEWIS,

                                        Defendants.
----------------------------------------------------------------X

09 Civ. 5064 (RMB)

**DECISION & ORDER**

## I.    Introduction

On June 18, 2009, SRM Global Fund Limited Partnership ("Plaintiff" or "SRM") filed an

amended complaint ("Amended Complaint") against Countrywide Financial Corporation n/k/a

Bank of America Home Loans ("Countrywide"), former Countrywide officers and directors

Angelo Mozilo ("Mozilo"), David Sambol ("Sambol"), Eric Sieracki ("Sieracki") (collectively,

"Individual Countrywide Defendants" and, with Countrywide, the "Countrywide Defendants"),

as well as Bank of America Corporation ("Bank of America" or "BofA") and former Bank of

America Chief Executive Officer Kenneth Lewis ("Lewis") (with Bank of America, the "Bank of

America Defendants").[1]  Plaintiff asserts as to the Countrywide Defendants and the Bank of

America Defendants (collectively, "Defendants") claims pursuant to Section 10(b) of the

---

[1]      Plaintiff is a multi-billion dollar hedge fund that takes "'a contrarian and long-term
investment' approach in 'companies or sections [that] have been through periods of stress and
are out of favor with the market.'"  (Decl. of Roger Cooper, dated Sept. 21, 2009 ("Cooper
Decl."), Ex. A (Tom Cahill & Katherine Burton, Wood's SRM Fell 30% in January, Adding to
2007 Losses, Bloomberg.com, Feb. 6, 2008)); see p. 25, infra.  Defendant Bank of America
acquired Countrywide on July 1, 2008 and during the following year "rebrand[ed] all
Countrywide operations as Bank of America Home Loans."  (Am. Compl. ¶ 19; Countrywide,
2008 Annual Report, at 5 (Mar. 9, 2009).)

Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. § 78j(b) ("Section 10(b)"), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and a claim of common law fraud.[2] (See Am. Compl. ¶¶ 18–26, 312–42.) As to the Countrywide Defendants, Plaintiff also asserts a claim pursuant to Section 18 of the Exchange Act, 15 U.S.C. § 78r ("Section 18"). (See Am. Compl. ¶¶ 318–22.) And, as to the Individual Countrywide Defendants and the Bank of America Defendants, Plaintiff also asserts a claim pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"). (See Am. Compl. ¶¶ 323–30.)

At the core of Plaintiff's Amended Complaint is the allegation that SRM owned approximately 50 million shares of "Countrywide . . . common stock and other securities" in 2008 and that this investment "lost nearly 90% of its value in just nine months as the truth about the problems at Countrywide concealed by Defendants' misrepresentations and omissions were gradually revealed." (Am. Compl. ¶¶ 12, 18, 312–42.) The alleged misrepresentations and omissions include, among others, that the Countrywide Defendants on September 26, 2006 "knew they were 'flying blind' with respect to the value of [Countrywide's] substantial pay-option adjustable rate mortgage ('pay-option ARM') portfolio and thus . . . had no reasonable basis for [their] assurances about Countrywide's financial condition" and that Defendants did not

---

[2]     Plaintiff (and other Countrywide shareholders) previously brought an action against Bank of America and others in Delaware Chancery Court. See In re Countrywide Corp. Shareholders Litig., C.A. No. 3464-VCN, 2009 WL 2595739, at *1 (Del. Ch. Aug. 24, 2009). The Court rejected certain objections made by SRM to a proposed settlement of that action because, among other reasons, "SRM's potential federal securities law claims possess no obvious value" and because claims of alleged misstatements and omissions made by Lewis appeared "to be yet another likely unavailing attempt to mitigate losses resulting from Countrywide's collapse." Id. at *4; see pp. 21–22 & note 6, infra.

disclose until June 3, 2008 that "Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared [on] August [2,] 2007."[3] (Am. Compl. ¶¶ 7, 152.)

On September 21, 2009, Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") arguing, among other things, that: (1) Plaintiff's claims against all Defendants under Section 10(b) and Rule 10b-5 should be dismissed because Plaintiff "fails to identify any actionable misstatement"; (2) Plaintiff's Section 18 claim against the Countrywide Defendants should be dismissed because Plaintiff's "slim reliance allegations fall woefully short of" pleading with particularity "facts probative of their actual reliance on any specific statement"; (3) Plaintiff's Section 20(a) claim against the Individual Countrywide Defendants and the Bank of America Defendants should be dismissed because "Plaintiff fails to adequately plead that any [D]efendant violated Sections 10(b) or 18"; and (4) Plaintiff's common law fraud claim should be dismissed because, "[a]s a sophisticated investor, SRM could not justifiably rely on [D]efendants' vague and optimistic statements about Countrywide's operations." (Defs.' Consolidated Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., dated Sept. 21, 2009 ("Mot."), at 8–35.)[4]

On October 29, 2009, Plaintiff submitted an opposition arguing, among other things, that: (1) Plaintiff has sufficiently alleged that Defendants violated Section 10(b) and Rule 10b-5 because Plaintiff "has identified actionable misrepresentations and omissions"; (2) the Amended

---

[3]     "Pay-option ARMs are a type of [adjustable rate mortgage] designed to give buyers flexibility in paying back their mortgage. The buyer may, in a given month, choose (1) to pay down the principal; (2) make an interest-only payment; or (3) make a minimum payment lower than the interest for the period. If a buyer chooses option 3, the remaining interest will be capitalized." In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1150 (C.D. Cal. 2008).

[4]     Defendants also argue that Plaintiff's claim under Section 10(b) and Rule 10b-5 does not sufficiently state a claim because Plaintiff "fails to plead particularized facts raising the requisite strong inference of scienter." (Mot. at 18); see also note 7, infra.

Complaint states a Section 18 claim against the Countrywide Defendants because it "is replete with express allegations that SRM read the representations at issue . . . and actually relied on specific statements in filed documents"; (3) "the Amended Complaint states a Section 20(a) claim" because Plaintiff "has adequately pled primary violations of Section 10(b) by control persons"; and (4) Plaintiff states a common law fraud claim because the sophisticated investor doctrine "applies only where a plaintiff has access to information contradicting the fraud but fails to take advantage of that access." (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, dated Oct. 29, 2009 ("Opp'n"), at 10–34.) In addition, Plaintiff argues that "[i]f Defendants' motion is granted, leave to replead should be granted." (Opp'n at 34.).

On November 23, 2009, Defendants submitted a reply. (Reply, dated Nov. 23, 2009 ("Reply").) Oral argument was held on May 5, 2010. (See Tr. of Proceedings, dated May 5, 2010 ("Hr'g Tr.").)

**For the reasons set forth below, Defendants' motion to dismiss is granted.**

## II. Background

For the purposes of this motion, the allegations of the Amended Complaint are taken as true. See Almonte v. City of Long Beach, 478 F.3d 100, 104 (2d Cir. 2007).

Plaintiff is a "private investment fund that invests in a variety of asset classes on behalf of dozens of investors." (Am. Compl. ¶ 18.) From on or about July 24, 2007 to on or about June 24, 2008 (the "Relevant Period"), Plaintiff owned common stock and other securities issued by Countrywide which was "an industry leader in originating and servicing subprime mortgages [i.e.,] mortgage loans made to borrowers who do not qualify for the best market interest rates because of their deficient credit histories or scores." (Am. Compl. ¶¶ 18, 46.) During the Relevant Period, Mozilo was "Chairman of the Board and Chief Executive Officer of

4

Countrywide," Sambol was "Countrywide's President and Chief Operating Officer and became a director of Countrywide in September 2007," and Sieracki was "Executive Managing Director and Chief Financial Officer of Countrywide." (Am. Compl. ¶¶ 20–22.)

**The Flying Blind Email**

On September 26, 2006, Mozilo sent an email to Sambol and Sieracki (the "flying blind email") in which Mozilo stated that "[w]e have no way, with any reasonably certainty, to assess the real risk of holding [pay-option ARM] loans on our balance sheet. . . . The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales." (Am. Compl. ¶ 149.)

Defendants contend that the flying blind email is not the "smoking gun" that Plaintiff makes it out to be because Countrywide repeatedly disclosed to the public "risks about [pay-option] ARMs and the uncertainty of their performance in a stressed environment." (Reply at 4.) For example, on July 25, 2006, Mozilo warned that if "rates continue to rise significantly, then these resets and payment shocks will be substantial" on pay-option ARMs and he further explained that "we just need time to see how this is going to play out. . . . The test will be when the resets take place and I'm not certain exactly what's going to happen there." (Supplemental Decl. of Roger Cooper, dated Nov. 23, 2009 ("Supplemental Cooper Decl.") Ex. LL (Tr. of Q2 2006 Earnings Call, dated July 25, 2006) at 12–13).) And, Countrywide advised investors in its 2006 Form 10-K, filed on March 1, 2007 – i.e., before Plaintiff's first alleged purchase of Countrywide securities on or about July 24, 2007 (see Am. Compl. ¶ 46) – that "[d]ue to the lack of significant historical experience at Countrywide, the credit performance of [pay-option ARM] loans has not been established for the Company." (Cooper Decl., dated Sept. 21, 2009, Ex. Y (2006 Form 10-K, dated Mar. 1, 2007) at 107.)

Plaintiff alleges that as of September 26, 2006 the Countrywide Defendants "knew they were 'flying blind' with respect to the value of [Countrywide's] substantial pay-option adjustable rate mortgage ('pay-option ARM') portfolio and thus knew that Countrywide's true financial condition was precarious and . . . had no reasonable basis for [their] assurances about Countrywide's financial condition." (Am. Compl. ¶ 152.) According to Plaintiff, "Countrywide could not, on one hand, be clueless as to how its pay-option ARMs would behave under adverse economic conditions and at the same time truthfully state that it would have access to adequate sources of liquidity 'under all market conditions.'" (Opp'n at 14.) Plaintiff contends that the following representations made by the Countrywide Defendants were false or misleading in light of the flying blind email:

- In Countrywide's 2006 Form 10-K, filed on March 1, 2007, "the Countrywide Defendants represented that Countrywide had implemented a Liquidity Management Plan which would 'ensure that [Countrywide] maintain[ed] adequate, appropriate and cost-effective sources of liquidity under all market conditions.'" (Am. Compl. ¶ 113.)

- "On or about May 23, 2007, Countrywide hosted a Fixed Income Investor Day meeting in New York City [at which] Sambol represented . . . that Countrywide's 'core fundamentals are strong.'" (Am. Compl. ¶ 38.) And, "Sieracki's presentation at the Investor Day meeting touted Countrywide's '[s]trong asset liquidity and quality.'" (Am. Compl. ¶ 39.)

- "On June 13, 2007, at Countrywide's annual stockholder meeting . . . Mozilo boasted of Countrywide's 'integration of strong capital and risk-management activities' which 'keep our Company in excellent fiscal condition.'" (Am. Compl. ¶ 41.)

- Countrywide conducted a teleconference with, among others, SRM on or about July 24, 2007 concerning its earnings for the second quarter of 2007 during which Mozilo stated that "the Company is well[-]positioned to capitalize on opportunities during this transition[al] period in the mortgage business, which we believe will enhance the Company's long term earnings growth prospects." (Am. Compl. ¶ 43.) During this teleconference, Sieracki stated that Countrywide has "adequate diversified and reliable sources of liquidity available." (Am. Compl. ¶ 43); see pp. 14–17, infra.

Based upon these alleged misrepresentations, among others, Plaintiff allegedly purchased "nearly 5.5 million shares of Countrywide common stock in the week following Countrywide's Q2 2007 earnings call" on July 24, 2007. (Am. Compl. ¶ 46.)

As noted in a press release issued by Countrywide on October 26, 2007, during the third quarter of 2007 there was an "unprecedented disruption in the capital markets and [an] abrupt loss in demand for non-agency loans and securities [as well as] increased credit costs related to continued deterioration in the housing market." (Decl. of Philip Korologos, dated Oct. 21, 2009 ("Korologos Decl."), Ex. H (Press Release, Countrywide, Countrywide Reports a Loss of $1.2 Billion for the 2007 Third Quarter (Oct. 26, 2007)).) "On October 27, 2007, Countrywide issued a press release and filed a Form 8-K announcing Countrywide's financial results for the third quarter of 2007, which included a quarterly loss of $1.25 billion, or $2.85 per share [and] a $1 billion write down of its loans and mortgage-backed securities." (Am. Compl. ¶ 7.)

On February 29, 2008, Countrywide filed its Form 10-K for 2007 with the United States Securities and Exchange Commission ("SEC"), in which it disclosed that "Countrywide held $28.42 billion of pay-option [ARMs], and that the percentage of such loans which were at least 90 days past due had risen 800% from a year earlier, from 0.6% to 5.4%" and "71% of its pay-option adjustable rate mortgage borrowers were making only minimal payments [that] cover[ed] only part of the interest normally due, [thus] causing their loan balance to grow." (Am. Compl. ¶ 295.)

**Bankruptcy Rumors**

"On or about August 13, 2007, Merrill Lynch & Co. issued an analyst report [stating that] '[Countrywide] currently has about $185 [billion] in available credit facilities, though the concern is that these facilities could be terminated or the terms changed meaningfully, thus

7

impacting [Countrywide's] ability to operate normally. . . . [I]t is possible for [Countrywide] to go bankrupt.'" (Am. Compl. ¶ 60.)

On or about August 23, 2007, Mozilo was interviewed on CNBC and during this interview he "denounced the Merrill Lynch & Co. analysis of Countrywide as 'baseless' and 'irresponsible' and stated that 'there is no more chance for bankruptcy today for Countrywide than there was six months ago, a year ago, two years ago. . . . [W]e are a very solid company.'" (Am. Compl. ¶ 62.)

Plaintiff alleges that it purchased "more than 10.5 million shares of Countrywide common stock in the [three] weeks following . . . Mozilo's CNBC interview." (Am. Compl. ¶ 65.)

On January 11, 2008, Bank of America "announced a definitive arrangement to purchase Countrywide . . . in an all-stock transaction worth approximately $4 billion [which] represented less than 30% of Countrywide's most recently reported book value." (Am. Compl. ¶ 289.) "In Plaintiff's view, the agreed price for Bank of America's acquisition of Countrywide was too low, given the Countrywide Defendants' repeated reassurances in public statements and directly to Plaintiff regarding Countrywide's financial condition." (Am. Compl. ¶ 108.)

On January 14, 2008, "Lewis spoke in support of the merger, telling the investing public on behalf of Bank of America that Countrywide's bankruptcy was just 'a malicious rumor'" and that, after having "conducted twice as much due diligence as [Bank of America] ordinarily might have," Bank of America concluded that "there is great long-term value embedded in Countrywide's business" and that Countrywide "had a very impressive liquidity plan [and] had

[its] backup lines in place." (Am. Compl. ¶¶ 6, 98); <u>see</u> p.19, <u>infra</u>. On July 1, 2008, Bank of America completed its acquisition of Countrywide.[5] (Am. Compl. ¶ 19.)

**June 3, 2008 Meeting**

On June 3, 2008, Ian Barclay ("Barclay"), John Myers ("Myers"), and Jon Wood ("Wood"), all of whom Plaintiff identifies as "from SRM," met with Mozilo, Sambol and Sieracki. (Am. Compl. ¶¶ 86, 124.) "At that meeting . . . Mozilo told Plaintiff that Countrywide had gone from being a viable company to being not viable during one week nearly a year before, in July 2007" and "Sambol told SRM that liquidity disappeared in one day on August 2, 2007." (Am. Compl. ¶¶ 125–26.)

Plaintiff alleges that Countrywide made certain representations before the June 3, 2008 meeting that "failed to disclose that liquidity had disappeared [on August 2, 2007] or that Countrywide had ceased to be a viable company the month before, [thus] omitting material facts peculiarly in . . . Defendants' knowledge and not readily available to Plaintiff," (Am. Compl. ¶ 59), including:

- "On August 2, 2007, Countrywide issued a press release entitled 'Countrywide Comments on Its Strong Funding Liquidity and Financial Condition,' stating that . . . 'our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today. . . . Our mortgage company has significant short-term funding liquidity cushions. . . . In fact, we have almost $50 billion of highly reliable short-term funding liquidity available as a cushion today.'" (Am. Compl. ¶ 49.)

- Countrywide's "August 6, 2007 [Form] 8-K . . . contained Countrywide's 'Liquidity Sources' schedule as of June 30, 2007 which reported that Countrywide's net available liquidity was $186.5 billion." (Am. Compl. ¶ 53.)

---

[5]     According to Bank of America, "[t]he purchase [of Countrywide was to] make Bank of America the nation's largest mortgage lender and loan servicer." (Press Release, Bank of America, Bank of America Agrees to Purchase Countrywide Financial Corp. (Jan. 11, 2008)). Bank of America completed this purchase on July 1, 2008. (<u>See</u> Am. Compl. ¶ 19); <u>see also</u> note 1 and pp. 4–5, <u>supra</u>.

- On or about December 28, 2007, Barclay, Myers, and Wood participated in a teleconference with Countrywide Investor Relations employee David Bigelow ("Bigelow") and Sieracki during which Bigelow and Sieracki "confirmed . . . Countrywide's public statements regarding Countrywide's financial condition, liquidity and capital reserves" and "told Plaintiff that Countrywide had sufficient liquidity to last for twelve months." (Am. Compl. ¶¶ 86–88); see pp. 17–18, infra.

Based upon these "misrepresentations," among others, Plaintiff allegedly purchased "over 8.4 million shares" of Countrywide in a two-week period following Plaintiff's December 28, 2007 teleconference with Bigelow and Sieracki. (Am. Compl. ¶¶ 46, 65, 91.)

"Beginning on or about June 24, 2008, Plaintiff sold its Countrywide stock [and thereby] suffer[ed] substantial losses." (Am. Compl. ¶¶ 131–32.)

## III.    Legal Standard

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" S. Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. --, 129 S.Ct. 1937, 1949 (2009)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 129 S.Ct. at 1949).

"To state a claim under § 10(b) and the corresponding Rule 10b-5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000).

"To state a claim under Section 18, a plaintiff must plead that (1) a false or misleading statement was contained in a document filed pursuant to the Exchange Act (or any rule or regulation thereunder); (2) defendant made or caused to be made the false or misleading

statement; (3) plaintiff relied on the false statement; and (4) the reliance caused loss to the plaintiff." In re Alstom SA, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005).

To establish a prima facie case of a violation under Section 20(a), a plaintiff must show "a primary violation by the controlled person and control of the primary violator by the targeted defendant and show that the controlling person was in some meaningful sense [a] culpable participant[] in the fraud perpetrated by [the] controlled person[]." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotation marks omitted).

"A New York common law fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104–05 (2d Cir. 2001).

"Although Fed. R. Civ. P. 15(a) provides that the district court should freely grant leave to amend when justice so requires, it is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile." Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 728 (2d Cir. 1998); see also Campo v. Sears Holdings Corp., No. 09-3589-cv, 2010 WL 1292329, at *4 (2d Cir. Apr. 6, 2010). "Amendment of a complaint is futile where the proposed amended complaint would be unable to withstand a subsequent motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)." Tatum v. Oberg, No. 08 Civ. 1251, 2009 WL 5066812, at *2 (D. Conn. Dec. 18, 2009) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

## IV.    Analysis

When a district court decides a motion to dismiss a complaint alleging securities fraud, it may, as is done here, review and consider public disclosure documents required by law to be and

which actually have been filed with the SEC. See Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d Cir. 1991).

**(1)     Section 10(b) and Rule 10b-5 Claims**

Defendants argue, among other things, that Plaintiff fails to identify any actionable misstatement because: (a) "Countrywide repeatedly disclosed risks about [pay-option] ARMs and the uncertainty of their performance in a stressed environment"; (b) Plaintiff "fails to cite a single fact contemporaneous with any of the challenged statements supporting the bald assertion that 'Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared [on] August [2,] 2007'"; (c) Plaintiff "alleges no facts to demonstrate that Countrywide's bankruptcy was anything more than a rumor"; and (d) Plaintiff's "claims against the BofA Defendants boil down to a dispute over Lewis's choice of optimistic, rather than gloomy, adjectives."  (Mot. at 9–17, 25–26; Reply at 1–8.)

Plaintiff counters, among other things, that Plaintiff has identified actionable misrepresentations and omissions because (a) "every statement made by the Countrywide Defendants in 2007–2008 regarding Countrywide's financial condition . . . was inherently misleading by failing to disclose that Countrywide was 'flying blind' with respect to the risks posed by the largest class of assets on its balance sheet," see pp. 14–17, infra; (b) Plaintiff's contention that Defendants had contemporaneous knowledge of the fact that Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared on August 2, 2007 is supported by the "compelling inference . . . that [the Countrywide Defendants] could, nearly a year later, identify so precisely when Countrywide ceased to be viable and liquidity disappeared because they recognized those events at or about the time they happened," see pp. 17–18, infra; (c) Defendants' assurances that "Countrywide's bankruptcy was 'just a malicious rumor'

12

[omitted] the material fact that Countrywide was not a viable company," <u>see</u> p. 19, <u>infra</u>; and (d) "Lewis's omission . . . not his choice of adjectives . . . made his statement false and misleading," <u>see</u> pp. 19–22, <u>infra</u>. (Opp'n at 10–21.)

"Securities fraud actions are . . . subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ('PSLRA'), Pub. L. No. 104-67, 109 Stat. 737, as well as those of Federal Rule of Civil Procedure 9(b) ('Rule 9(b)')," <u>Varghese v. China Shenghuo Pharm. Holdings, Inc.</u>, 672 F. Supp. 2d 596, 604–05 (S.D.N.Y. 2009), which require that plaintiffs "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Stevelman v. Alias Res., Inc.</u>, 174 F.3d 79, 84 (2d Cir. 1999) (citations and internal quotation marks omitted); <u>see also</u> <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001); <u>Novak v. Kasaks</u>, 216 F.3d 300, 306 (2d Cir. 2000) (citations omitted).

Each of the misrepresentations alleged in the Amended Complaint were made in financial disclosures, news articles, television programs, (tele)conferences, or press releases which (1) specify the statements that Plaintiff contends were fraudulent, (2) identify the speaker and (3) state where and when the statements were made. (<u>See, e.g.</u>, Am. Compl. ¶¶ 31–80); <u>see also</u> <u>Stevelman</u>, 174 F.3d at 84. Plaintiff has satisfied the first three prongs of the Rule 9(b) requirements. <u>See</u> <u>In re Globalstar Sec. Litig.</u>, No. 01 Civ. 1748, 2003 WL 22953163, at *5 (S.D.N.Y. Dec. 15, 2003).

The "fourth prong" is critical to the analysis here. And, with respect to the fourth prong, the Court separately analyzes: (a) the flying blind email; (b) the June 3, 2008 meeting; (c) Mozilo's and Lewis's denials of rumors of bankruptcy; and (d) other alleged misrepresentations by the Bank of America Defendants, as follows:

**Flying Blind Email**

"[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed." In re Progress Energy, Inc., 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005); see also Ganino, 228 F.3d at 167 ("a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market"). Countrywide warned investors in its 2006 Form 10-K, filed on March 1, 2007, i.e., approximately five months before Plaintiff's first purchase of Countrywide securities, (see Am. Compl. ¶ 46), that "[d]ue to the lack of significant historical experience at Countrywide, the credit performance of [pay-option ARM] loans has not been established for the Company." (2006 Form 10-K, dated Mar. 1, 2007, at 107). Plaintiff does not explain why or how this Form 10-K disclosure was deficient. See In re IAC/InterActiveCorp Sec. Litig., No. 04 Civ. 7447, 2010 WL 996483, at *6–7 (S.D.N.Y. Mar. 19, 2010). While the term "flying blind" may more colorfully convey Countrywide's "lack of significant historical experience" with pay-option ARMs, "the [D]efendants were under no duty to 'employ the adjectorial [sic] characterization' that the [P]laintiff[] believe[s] is more accurate." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1069 (5th Cir. 1994).

Defendants made additional disclosures regarding pay-option ARMs before and during the Relevant Period. For example, on July 26, 2005, Mozilo stated that although pay-option ARMs were Countrywide's "lowest delinquency product at the moment . . . you have to wait some time for loans to mature a year, two years, even three years to determine how they're going to perform." (Supplemental Cooper Decl. Ex. KK (Tr. of Q2 2005 Earnings Call, dated July 26, 2005) at 15.) Similarly, on July 25, 2006, Mozilo warned that if "[interest] rates continue to rise significantly, then the[] resets and payments shocks will be substantial" on pay-option ARMs.

14

(Tr. of Q2 2006 Earnings Call, dated July 25, 2006, at 12–13.) He further explained that "we just need time to see how this is going to play out. . . . The test will be when the resets take place and I'm not certain exactly what's going to happen there." (Tr. of Q2 2006 Earnings Call, dated July 25, 2006 at 13.) And, in Countrywide's 2007 Form 10-K, filed with the SEC on February 28, 2008, Countrywide disclosed that it "has a significant investment in [pay-option loans]). Pay-option loans represent 32% and 45% of the Company's investment in mortgage loans held for investment at December 31, 2007 and 2006, respectively." (Cooper Decl. Ex. C (2007 Form 10-K, dated Feb. 28, 2008) at F-43.) With respect to these loans, Countrywide also disclosed in its 2007 Form 10-K that "[o]ur borrowers' ability to defer portions of the interest accruing on their loans may expose us to increased credit risk. This is because when the required monthly payments for these loans eventually increase, borrowers may be less able to pay the increased amounts and may be more likely to default than a borrower with a loan whose initial payment provides for full amortization. Our exposure to this higher credit risk is increased by the amount of deferred interest that has been added to the principal balance." (2007 Form 10-K, dated Feb. 28, 2008, at 126.)

"The Court is aware that whether an allegedly omitted fact was available to the market often is a fact intensive inquiry that is 'rarely an appropriate basis for dismissing.'" In re Pfizer, Inc. Sec. Litig., 538 F. Supp. 2d 621, 632 n.61 (S.D.N.Y. 2008) (quoting Ganino, 228 F.3d at 167). "However, 'rarely appropriate' is not the same as 'never appropriate . . . .'" Id. (citation omitted). Here, Countrywide's lack of significant historical experience with pay-option ARMs was clearly disclosed in a document filed with the SEC on March 1, 2007. (See 2006 Form 6-K, filed Mar. 1, 2007.) "[T]he facts here show that all the information [P]laintiff[] claim[s] was concealed by [D]efendants was publicly available . . . and on these facts the law renders

[D]efendants' purported misstatements immaterial." White v. H & R Block, Inc., No. 02 Civ. 8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004); see also In re Merrill Lynch Auction Rate Sec. Litig., -- F. Supp. 2d --, No. 09 MD 2030, 2010 WL 1257597, at *15 (S.D.N.Y. Mar. 31, 2010).

Plaintiff's claim that certain statements made by the Countrywide Defendants after Mozilo sent the flying blind email to Sambol and Sieracki (e.g., "the Company is well[-]positioned to capitalize on opportunities during this transition[al] period in the mortgage business," (Am. Compl. ¶ 43), and "[Countrywide] maintain[ed] adequate, appropriate and cost-effective sources of liquidity under all market conditions," (Am. Compl. ¶ 113)) were misleading is "undermined also by the theory upon which it is based – namely, fraud-on-the-market theory – because the market price of a stock is presumed to reflect 'all publicly available information.'" White, 2004 WL 1698628, at *12 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 246 (1988)). Such publicly available information includes Countrywide's 2006 and 2007 Forms 10-K and statements made during a July 25, 2006 teleconference with Mozilo and analysts. (See 2006 Form 10-K, dated Mar. 1, 2007, at 107 ("[d]ue to the lack of significant historical experience at Countrywide, the credit performance of [pay-option ARM] loans has not been established for the Company"); (Tr. of Q2 2006 Earnings Call, dated July 25, 2006 at 13 ("we just need time to see how this is going to play out. . . . I'm not certain exactly what's going to happen there"); 2007 Form 10-K, dated Feb. 28, 2008, at 126 ("[o]ur borrowers' ability to defer portions of the interest accruing on their loans may expose us to increased credit risk").) Plaintiff acknowledges that the market for Countrywide securities efficiently digested current information regarding the company from all publicly available sources and reflected such information in the price of Countrywide's securities. (Am. Compl. ¶ 310; see also Cooper Decl. Ex. C (Countrywide 2006

16

Form 10-K, dated Mar. 31, 2007) at 44, 64 (stating that, as of December 31, 2006, Countrywide held $32.9 billion in pay-option ARMs); Countrywide 2007 Form 10-K, dated Feb. 28, 2008, at 48 & F-45 (stating that, as of December 31, 2007, Countrywide held $29 billion in pay-option ARMs); Korologos Decl., Ex. B (First Quarter 2007 Form 10-Q), at 1, 42; Ex. C (Second Quarter 2007 Form 10-Q), at 1, 86; Ex. D (Third Quarter 2007 Form 10-Q), at 1, 100)); see also pp. 5, 14–16, supra. Thus, "Plaintiff[] cannot use this presumption to argue that the market price reflected [D]efendants' purported misstatements but not the true statements contained in [Defendants'] press releases and SEC filings . . . ." White, 2004 WL 1698628, at *12; see also In re Pfizer, Inc. Sec. Litig., 538 F. Supp. 2d at 632.

**June 3, 2008 Meeting**

The Amended Complaint does not contain any allegations of facts supporting Plaintiff's contention that any Defendant knew, prior to the June 3, 2008 meeting, that "Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared [on] August [2,] 2007."[6] (Am. Compl. ¶ 7, 125–26); see Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) ("Plaintiff fails to allege facts that particularize how and why each defendant actually knew, or was reckless in not knowing, that the alleged statements and omissions were fraudulent at the time they were made." (emphasis omitted)). It is not sufficient for Plaintiff to contend that the Countrywide Defendants (must have) had access to contrary facts. See Novak, 216 F.3d at 309; see also ATSI Commnc'ns v. Shaar Fund, 493 F.3d 87, 98 (2d Cir. 2007) ("[a]llegations that are conclusory or unsupported by factual assertions are insufficient" under Rule 9(b)). The "compelling inference" urged by Plaintiff, i.e., "that [the

---

[6]     Defendants argue that the Amended Complaint "makes no attempt to quote what Mozilo or Sambol actually said about Countrywide's liquidity or viability, and offers no details [of the June 3, 2008 meeting]." (Mot. at 14.)

17

Countrywide Defendants] could, nearly a year later, identify so precisely when Countrywide ceased to be viable and liquidity disappeared because they recognized those events at or about the time they happened," (Opp'n at 15), is unavailing because "the mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made." Elliott Assoc., L.P. v. Covance, Inc., No. 00 Civ. 4115, 2000 WL 1752848, *7 (S.D.N.Y. Nov. 28, 2000). Plaintiff "must specifically identify the reports or statements containing this information," id., that were allegedly available to Defendants and which showed that "Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared [on] August [2,] 2007." (Am. Compl. ¶¶ 7, 152); see Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, No. 08 Civ. 8143, 2010 WL 961596, at *10 (S.D.N.Y. Mar. 17, 2010) ("Plaintiff has not 'specifically identified any reports or statements' or any dates or time frame in which [d]efendants were put on notice of contradictory information." (citations omitted)); (see also Hr'g Tr. at 5:11-16 ("MS. KOTLER [counsel for the Countrywide Defendants]: [P]laintiff do[es] not claim that either Mr. Mozilo or Mr. Sambol said at this meeting that they knew or believed, as of August 2007, that the company was no longer viable without liquidity. These were statements made in and as of June 2008, with the benefit of hindsight, after having lived through the mortgage and housing crisis for a year.")); In re Sec. Capital Assur. Ltd. Sec. Litig., No. 07 Civ. 11086, 2010 WL 1372688, at *26 (S.D.N.Y. Mar. 31, 2010) ("Defendants, 'like so many other institutions' floored by the housing market crisis 'could not have been expected to anticipate the crisis with the accuracy [p]laintiff[s] enjoy[] in hindsight.'" (citations omitted)).

**Bankruptcy Rumors**

Mozilo and Lewis argue, among other things, that Plaintiff "alleges no facts to demonstrate that Countrywide's bankruptcy was anything more than a rumor." (Mot. at 25.) Plaintiff counters, among other things, that assurances that "Countrywide's bankruptcy was 'just a malicious rumor' [omitted] the material fact that Countrywide was not a viable company." (Opp'n at 26.)

Plaintiff does not identify any document or statement made by any of the Defendants which indicates that, during the Relevant Period, Countrywide was on the verge of or considering bankruptcy. See Novak, 216 F.3d at 309; see also In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 23 (S.D.N.Y. 2004) ("To support their claim that defendants' failure to disclose material problems made otherwise unobjectionable statements misleading, plaintiffs must allege an adequate basis for supposing that such problems actually existed."). Even assuming, arguendo, that Plaintiff has sufficiently alleged (which it has not) that "Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared [on] August [2,] 2007," (Am. Compl. ¶ 7), Plaintiff fails to support its apparent assumption that bankruptcy was the only option for Countrywide as opposed, for example, to a merger (which, in fact, occurred), a sale of assets, a reduction in expenses or capital expenditures, a new business strategy, or an acquisition of additional credit lines. See In re Countrywide Corp. Shareholders Litig., 2009 WL 2595739, at *1 ("The Countrywide board decided that a merger transaction with BOA offered the most stability for Countrywide . . . .").

**Other Alleged Misstatements and Omissions by the Bank of America Defendants**

The Bank of America Defendants argue, among other things, that Plaintiff's "fraud claims against the BofA Defendants boil down to a dispute over Lewis's choice of optimistic,

19

rather than gloomy, adjectives" and are, therefore, non-actionable "puffery." (Mot. at 26.)

Plaintiff counters, among other things, that Lewis's statements that "Countrywide's liquidity

plan was 'impressive' and that Countrywide 'had its backup lines in place' [were] false and

misleading as Lewis omitted material facts." (Opp'n at 26.)

Lewis's representation that "Countrywide's liquidity plan was impressive," (Am. Compl.

¶ 98), is "plainly an expression of optimism that is too indefinite to be actionable under the

securities laws." In re IBM Corp. Sec. Litig., 163 F.3d 102, 108 (2d Cir. 1998); see also San

Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 811 (2d

Cir. 1996); In re NVE Corp. Sec. Litig., 551 F. Supp. 2d 871, 903 (D. Minn. 2007).

And, as to Lewis's alleged representation on January 14, 2008 that Countrywide "had its

backup lines in place," (Am. Compl. ¶ 98), Plaintiff "fails to allege with any specificity the

reason or reasons why [this] statement[] [was] false or misleading." Pollio v. MF Global, Ltd.,

608 F. Supp. 2d 564, 570 (S.D.N.Y. 2009); see Bond Opportunity Fund v. Unilab Corp., No. 99

Civ. 11074, 2003 WL 21058251, at *5 (S.D.N.Y. May 2, 2003) ("Plaintiffs who charge that a

statement of opinion . . . is materially misleading, must allege 'with particularity' 'provable

facts' to demonstrate that the statement of opinion is both objectively and subjectively false."

(quoting Va. Bankshares v. Sandberg, 501 U.S. 1083, 1093–98 (1991))). Specifically, Plaintiff

makes no allegation as to the existence or amount of backup lines possessed by Countrywide.

See Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) ("The consolidated

amended complaint merely alleges that Legg Mason was 'experiencing an increase' in broker

attrition and customer withdrawals. [Plaintiff] alleges no specific facts regarding the volume of

customer withdrawals or the rate of broker defections."); AIG Global Sec. Lending Corp. v.

Banc of Am. Sec. LLC, 254 F. Supp. 2d 373, 385 (S.D.N.Y.2003) (plaintiffs' claim failed to

satisfy Rule 9(b) because "[a]lthough the plaintiffs have claimed in conclusory terms that the loss figures were materially false, they have provided no indication of the amount by which the figures were supposedly under or overstated"); In re MSC Indus. Direct Co., 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003) (dismissing Section 10(b) claim alleging reserve manipulation for lack of particularity where "the amended complaint d[id] not allege what the inventory reserve for Enco or any other acquired company should have been").

And, even assuming, arguendo, that Plaintiff had sufficiently alleged that Lewis's statement on January 14, 2008 was false or misleading (which it did not do), Plaintiff "should, but do[es] not, provide specific instances in which [Bank of America or Lewis] received information that was contrary to [Lewis's] public declaration[]." Plumbers & Steamfitters Local 773 Pension Fund, 2010 WL 961596, at *9. Instead, Plaintiff alleges that Countrywide employees disclosed to Plaintiff on June 3, 2008 (during a meeting at which, according to Plaintiff, neither Lewis nor any other Bank of America employee was present) that "Countrywide had ceased to be a viable company in July 2007 and liquidity had disappeared [on] August [2,] 2007." (Am. Compl. ¶ 152.) Plaintiff failed to supply a factual basis for the allegation that the Bank of America Defendants knew or should have known that the statements were false during the time period alleged. See In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005); see also Faulkner v. Verizon Commnc'ns, Inc., 156 F. Supp. 2d 384, 396 (S.D.N.Y. 2001) ("It is well settled within this Circuit that a plaintiff cannot establish a claim under § 10(b) or Rule 10b-5 through 'fraud by hindsight.'" (citing Novak, 216 F.3d at 309; Stevelman, 174 F.3d at 85)).

As noted above in note 2, another court has determined in a separate litigation against Countrywide, Bank of America and others brought by certain shareholders of Countrywide,

including SRM (the Plaintiff here), that the very same statements that are alleged in the

Amended Complaint (e.g., that Countrywide had a very impressive liquidity plan and had its

backup lines in place, (see Am. Compl. ¶ 98)) "seem mere optimistic puffery; not actionable

under federal securities law." In re Countrywide Corp. Shareholders Litig., 2009 WL 2595739,

at *4.[7] The Delaware Court concluded that **"SRM's purported federal securities law claims**

**based on the Lewis Statements [were] yet another likely unavailing attempt to mitigate**

**losses resulting from Countrywide's collapse."**[8] Id. (emphasis added); see note 2, supra.

**(2)      Section 18**

In support of its Section 18 claim, Plaintiff alleges that the "Countrywide Defendants

made or caused to be made untrue statements in Countrywide's 2006 and 2007 Form 10-K

filings . . . and in Countrywide's 8-K filings on August 6, 2007 and October 26, 2007" regarding

Countrywide's "viability and liquidity," (see Am. Compl. ¶¶ 53, 112–117, 320.) But, for the

reasons stated in Section IV(1)(b), supra, these statements are not false or misleading. See

Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 287 (1993) (Section 18 is

"close in structure, purpose, and intent to the 10b-5 action"); see also In re Marsh & McLennan

---

[7]       Specifically, in the action brought in the Delaware Chancery Court, SRM and other
Countrywide shareholders alleged, among other things, that "directors of Countrywide[] had
violated their fiduciary duties owed to Countrywide's stockholders [and that Bank of America]
was alleged to have aided and abetted such violations." In re Countrywide Corp. Shareholders
Litig., 2009 WL 2595739, at *1. After certain plaintiffs and defendants "negotiated a settlement
agreement by which virtually all claims surrounding the merger would be released," SRM
objected to the proposed settlement because it "provides no monetary compensation to SRM."
Id. at *1 & *3. The Court concluded that "[b]ecause SRM's potential federal securities law
claims possess no obvious value, surrendering them in the context of this settlement for only
therapeutic disclosures is neither unfair nor unreasonable." Id. at *4; see also note 2, supra.

[8]       "Having concluded that [P]laintiff has failed to allege any materially misleading
misstatement or omission that is actionable under Section 10(b), [the Court] need not consider
[D]efendants' alternate argument that [P]laintiff has failed to adequately plead a strong inference
of scienter." Harborview Master Fund, LP v. Lightpath Tech., Inc., 601 F. Supp. 2d 537, 550
n.14 (S.D.N.Y. 2009).

Co. Sec. Litig., 501 F. Supp. 2d 452, 493 (S.D.N.Y. 2006) ("Pursuant to the language of Section 18, Plaintiffs must allege . . . specific actionable misstatements in MMC filings covered by Section 18 . . . ." (citing 15 U.S.C. § 78r)); Teachers' Ret. Sys. of L.A. v. Hunter, 477 F.3d 162, 188 (4th Cir. 2007) (Section 18 claims were "essentially dependent upon plaintiffs' success in alleging a claim under § 10(b) of the Exchange Act and Rule 10b-5").

As to Countrywide's October 26, 2007 Form 8-K filed with the SEC, Plaintiff does little more than summarize statements contained in the SEC filing regarding substantial losses sustained by Countrywide and does not explain how these statements were misleading or deficient. (See Am. Compl. ¶ 70 ("On October 26, 2007, Countrywide issued a press release and filed a Form 8-K announcing Countrywide's financial results for the third quarter of 2007, which included a quarterly loss of $1.25 billion, or $2.85 per share, Countrywide's first quarterly loss in 25 years. Countrywide also disclosed a $1 billion write down of its loans and mortgage-backed securities and a threefold increase in loan loss provisions over the prior quarter (a nearly 25-fold increase over the prior year)."); see Stevelman, 174 F.3d at 84; In re Alstom SA, 406 F. Supp. 2d at 478.

(3)     Section 20(a)

The Individual Countrywide Defendants and the Bank of America Defendants argue that Plaintiff's Section 20(a) claim should be dismissed because, among other reasons, "Plaintiff fails to plead adequately that any defendant violated Sections 10(b) or 18." (Mot. at 31.) Plaintiff counters, among other things, that "SRM has adequately pled primary violations of Section 10(b) by the controlled persons" as well as "culpable participation by alleging, with particularity, conscious misbehavior or recklessness by . . . Mozilo[,] Sambol[, and] Sieracki." (Opp'n at 31.)

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108.

Defendants' motion to dismiss Plaintiff's Section 20(a) claims is granted because, for the reasons stated in Section IV(1)–(2), supra, Plaintiff has failed to plead facts showing a primary violation of the securities laws by the allegedly controlled persons. See Alstom SA, 406 F. Supp. 2d at 486; see ATSI Commc'ns, 493 F.3d at 108 ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability."); Campo v. Sears Holdings Corp., 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009) ("As the Court concludes that the Complaint does not adequately allege that defendants made an actionable misstatement or material omission with scienter, the Court need not consider whether the Complaint adequately alleges . . . their Section 20(a) claims.").

**(4)    Fraud**

Defendants argue, among other things, that "[a]s a sophisticated investor, SRM could not justifiably rely on [D]efendants' vague and optimistic statements about Countrywide's operations." (Mot. at 32–33.) Plaintiff counters, among other things, that "[t]he 'sophisticated investor' doctrine invoked by Defendants applies only where a plaintiff has access to information contradicting the fraud but fails to take advantage of that access." (Opp'n at 32.)

"The elements of common law fraud . . . are largely the same as those of a Rule 10b-5 claim. . . ." Fraternity Fund Ltd. v. Beacon Hill Asset Mgm't LLC, 376 F. Supp. 2d 385, 407 (S.D.N.Y. 2005). However, the two actions maintain "meaningful distinctions." In re Marsh & McLennan Co., 501 F. Supp. 2d at 495. For example, "[c]ommon law fraud cases [are] to be

24

distinguished from cases that involved a fraud on the market theory or other theories in which reliance on a material omission is presumed to have existed . . . ." Redtail Leasing, Inc. v. Bellezza, No. 95 Civ. 5191, 1997 WL 603496, at *7 (S.D.N.Y. Sept. 30, 1997); see also Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 49 F. Supp. 2d 644, 656 (S.D.N.Y. 1999). And, "[u]nder New York law, 'the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud.'" Granite Partners, L.P. v. Bear, Stearns & Co., 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999) (citations omitted). "In evaluating whether a plaintiff has adequately alleged justifiable reliance, a court may consider, inter alia, the plaintiff's sophistication and expertise in finance, the existence of a fiduciary relationship, and whether the plaintiff initiated the transaction." Id.

Defendants' motion to dismiss is granted because Plaintiff has failed to allege that the Defendants made a material misstatement or omission. See Section IV(1), supra; see also Wint v. ABN AMRO Mtge. Group, Inc., 800 N.Y.S.2d 411, 412 (App. Div. 2005) (affirming dismissal of fraud claim for "fail[ing] to plead fraud with sufficient specificity" and "fail[ing] to allege any material misrepresentation by the defendant"). But, even assuming, arguendo, that Plaintiff had identified actionable misstatements or omissions, Plaintiff has failed to state a claim for common law fraud because, as a (very) sophisticated investor, its reliance upon these alleged misstatements or omissions would not be considered justifiable. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001) ("In evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration."). Plaintiff's fraud claim might (arguably) survive only if SRM had sufficiently alleged "justifiable reliance of the plaintiff on the misrepresentation or material omission." Shao v. 39 College Point Corp., 766 N.Y.S.2d 75, 76 (App. Div. 2003). Plaintiff is a multi-billion dollar hedge fund that

takes "'a contrarian and long-term investment' approach in 'companies or sections [that] have been through periods of stress and are out of favor with the market.'" (Tom Cahill & Katherine Burton, Wood's SRM Fell 30% in January, Adding to 2007 Losses, Bloomberg.com, Feb. 6, 2008); see note 1, supra. Moreover, prior to SRM's first alleged purchase of Countrywide securities on July 24, 2007, (see Am. Compl. ¶ 46), Countrywide warned investors in its 2006 Form 10-K, filed on March 1, 2007, that "[d]ue to the lack of significant historical experience at Countrywide, the credit performance of [pay-option ARM] loans has not been established for the Company." (2006 Form 10-K, dated Mar. 1, 2007, at 107; see Am. Compl. ¶ 46.). As a sophisticated investor, Plaintiff would be obligated to investigate information available to it "with the care and prudence expected from people blessed with full access to information." Hirsch v. duPont, 553 F.2d 750, 763 (2d Cir. 1977); see also In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001) ("Courts impose a more stringent standard on sophisticated investors, holding that they have an enhanced duty to obtain available information material to investment decisions."). Consequently, "[a]s a sophisticated institution contemplating the investment of tens of millions of dollars, it was unreasonable for [Plaintiff] to rely upon the highly general statements alleged as misstatements in this case." Ashland Inc. v. Morgan Stanley & Co., No. 09 Civ. 5415, 2010 WL 1253932, at *14 (S.D.N.Y. Mar. 30, 2010).

**Leave to Amend**

Plaintiff requests that "[i]f Defendants' motion is granted leave to replead should be granted so that SRM can file a[] [second] amended complaint that incorporates new information and documents derived from the recently filed SEC Complaint, as well as other lawsuits against Countrywide." (Opp'n at 35.)

Plaintiff's application is respectfully denied because Plaintiff was given ample advance notice of the bases for Defendants' Motion and because Plaintiff "does not propose any specific amendments." Kelter v. Apex Equity Options Fund, LP, No. 08 Civ. 2911, 2010 WL 2599607, at *10–11 (S.D.N.Y. Aug. 24, 2009). Plaintiff filed the original Complaint in this action on May 29, 2009 and the Amended Complaint was filed on June 16, 2009. (Compl., dated May 29, 2009; see also Am. Compl.) In four letters written to the Court by Countrywide, Sambol, Sieracki and Bank of America, respectively, requesting permission to file a motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), Defendants thoroughly explained the bases for their proposed motion(s). (See Ltr. from Meredith E. Kotler to Hon. Richard M. Berman, dated July 24, 2009; Ltr. from Lori Lynn Phillips to Hon. Richard M. Berman, dated July 24, 2009; Ltr. from Keara M. Gordon to Hon. Richard M. Berman, dated July 24, 2009; and Ltr. from Jonathan Rosenberg to Hon. Richard M. Berman, dated July 24, 2009.) And, at a conference with the Court on July 28, 2009, Defendants reiterated the bases for their proposed motion to dismiss but Plaintiff failed to request leave to file a second amended complaint at that time.[9] (See Docket Minute Entry for July 28, 2009); see In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 319 (S.D.N.Y. 2005) ("In light of the plaintiffs' failure to cure the defects after being provided notice, this is not a case where leave to amend should be given because 'justice so requires.'"). Accordingly, "[l]eave to amend is appropriately denied where,

---

[9]     Defendants' Motion was not filed until September 21, 2009, nearly two months after the conference.

27

as here, the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies." Kelter, 2009 WL 2599607, at *11.[10]

And, Plaintiff fails to identify with specificity those facts that would permit a second amended complaint to survive another motion to dismiss. (See Opp'n at 35); see also Arnold v. KPMG LLP, 334 F. App'x 349, 352–53 (2d Cir. 2009) (plaintiff "proffered only vague and general allegations of 'communications' and 'conversations' between [p]laintiff and [d]efendants"). Defendants, at oral argument on May 5, 2010, called attention to the fact that Plaintiff "has already amended once and . . . do[es not] actually say how [it] would want to replead," (Hr'g Tr. at 14:8-9), and Plaintiff did not and has not indicated how it could satisfy the requirements of stating a claim. See In re Am. Express Co. Shareholder Litig., 39 F.3d 395, 402 (2d Cir. 1994). "[I]t is hardly self-evident that [it] could transform the facts pleaded into a sufficient allegation." Id.; see In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 467 (S.D.N.Y. 2008) ("Nor was plaintiffs' counsel able to adduce at oral argument any additional information that would warrant giving plaintiffs leave to amend the already amended [c]omplaint."); see also Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986); In re Open Joint Stock Co. Vimpel-Commc'ns, No. 04 Civ. 9742, 2006 WL 647981, at *9 (S.D.N.Y. Mar. 14, 2006) (denying leave to amend as futile where proposed amendments "would not remedy plaintiffs' failure to identify specific misleading statements"); see Aimis Art Corp. v. N. Trust Sec., Inc., 641 F. Supp. 2d 314, 322 (S.D.N.Y. 2009); Siemens Westinghouse Power Corp. v. Dick Corp., 299 F. Supp. 2d 242, 249 (S.D.N.Y. 2004) ("The Court finds nothing in the proposed second

---

[10]     A principal purpose of a pre-motion to dismiss conference (and the letters which precede such a conference) is to provide a plaintiff with notice of purported deficiencies in his complaint so that he may attempt to cure them by amending his complaint before the motion is filed.

amended third-party complaint that remedies the deficiencies identified here. Thus, the proposed new filing would be futile, and the motion is denied.").

Amendment of a complaint is considered to be futile where, as here, "the proposed [second] amended complaint would be unable to withstand a subsequent motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)." Tatum v. Oberg, 2009 WL 5066812, at *2; see also Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990); Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 436 (S.D.N.Y. 2006) ("Granting leave to file an amended complaint is futile where the claims therein would not survive a motion to dismiss.").

## V. Conclusion and Order

For the reasons set forth above, Defendants' motion to dismiss [#45] is granted. The Clerk of Court is respectfully requested to close this case.

Dated: June 17, 2010
New York, New York

RMB

**RICHARD M. BERMAN, U.S.D.J.**